IAN N. FEINBERG (SBN 88324)
ifeinberg@feinday.com
M. ELIZABETH DAY (SBN 177125)
eday@feinday.com
MARC BELLOLI (SBN 244290)
mbelloli@feinday.com
**FEINBERG DAY KRAMER ALBERTI LIM
TONKOVICH & BELLOLI LLP**
577 Airport Blvd., Suite 250
Burlingame, CA. 94010
Tel: 650.825.4300/Fax: 650.460.8443

*Attorneys for Plaintiff* BioCardia, Inc.

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

#### SAN FRANCISCO DIVISION

| | |
|---|---|
| BIOCARDIA, INC.<br><br>Plaintiff,<br><br>v.<br><br>nVISION MEDICAL CORPORATION, ARBORETUM VENTURES IV, LP, ASTIA ANGEL nVISION LLC, CATALYST HEALTH VENTURES (PF), L.P., CATALYST HEALTH VENTURES FOLLOW-ON FUND, L.P., CATALYST HEALTH VENTURES III, L.P., CATALYST HEALTH VENTURES, LP, CHV INVESTMENTS, LLC, CHV PARTNERS FUND III, L.P., CHV-E PARTNERS III, L.P., DRAPER ASSOCIATES INVESTMENTS, LLC, DRAPER ASSOCIATES RISKMASTER FUND II, LLC, DRAPER ASSOCIATES RISKMASTERS FUND III, LLC, EXCELESTAR VENTURES I, LLC, EXXCLAIM CAPITAL PARTNERS I, LP, FOGARTY INSTITUTE FOR INNOVATION, GOLDEN SEEDS nVISION MEDICAL, LLC, LIFE SCIENCES ANGEL INVESTORS VIII, L.L.C., LMNVC, LLC, AND SERAPH nVISION, LLC,<br><br>Defendants. | CASE NO.  3:20-cv-02829-VC<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

-1-

Plaintiff BioCardia, Inc. ("BioCardia") alleges claims against defendants nVision Medical Corporation ("nVision"), Arboretum Ventures IV, LP , Astia Angel nVision LLC, Catalyst Health Ventures (PF) L.P., Catalyst Health Ventures Follow-On Fund, L.P., Catalyst Health Ventures III, L.P.,  Catalyst Health Ventures, LP, CHV Investments, LLC, CHV Partners Fund III, L.P., CHV-E Partners III, L.P., Draper Associates Investments, LLC, Draper Associates Riskmaster Fund II, LLC, Draper Associates Riskmaster Fund III, LLC, Excelestar Ventures I, LLC, eXXclaim Capital Partners I, LP, Fogarty Institute for Innovation, Golden Seeds nVision Medical, LLC, Life Sciences Angel Investors VIII, L.L.C., LMNVC, LLC and Seraph nVision, LLC (including nVision collectively "Defendants"; excluding nVision collectively the "Shareholder Defendants") seeking correction of inventorship, damages, including damages for Defendant's misappropriation of trade secrets and Ms. Surbhi Sarna's breach of contract, and imposition of constructive trusts on the Shareholder Defendants' unjust enrichment.

## PARTIES

1.     BioCardia is a corporation organized and existing under the laws of Delaware with its principal place of business at 125 Shoreway Road, Suite B, San Carlos CA 94070.

2.     BioCardia is informed and believes and on that basis alleges that Defendant nVision is a Delaware corporation with its principal place of business at 1192 Cherry Avenue, San Bruno, CA 94066, within this District, and is a wholly-owned subsidiary of Boston Scientific Corporation, a corporation organized and existing under the laws of the state of Delaware with its principal place of business at 300 Boston Scientific Way, Marlborough, MA 01752-l 234 which acquired nVision, including all of its intellectual property, through a Merger on April 13, 2018.

3.     BioCardia is informed and believes and on that basis alleges that defendant Arboretum Ventures IV, LP  is a Michigan Limited Partnership with a place of business at 303 Detroit St, Ste 301, Ann Abor, MI 48104 whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801 and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

-1-

4.      BioCardia is informed and believes and on that basis alleges that defendant Astia Angel nVision LLC is a Delaware Limited Liability Company with a place of business at One Market Plaza, Spear Tower 24th Floor San Francisco, CA 94105, whose agent for service is Harvard Business Services, Inc. 16192 Coastal Hwy Lewes, DE 19958, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

5.      BioCardia is informed and believes and on that basis alleges that defendant Catalyst Health Ventures (PF), L.P. is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

6.      BioCardia is informed and believes and on that basis alleges that defendant Catalyst Health Ventures Follow-On Fund, L.P. is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

7.      BioCardia is informed and believes and on that basis alleges that defendant Catalyst Health Ventures III, L.P. is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific

-2-

Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

8.    BioCardia is informed and believes and on that basis alleges that defendant Catalyst Health Ventures, LP is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

9.    BioCardia is informed and believes and on that basis alleges that defendant CHV Investments, LLC is a Massachusetts Limited Liability Company with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

10.    BioCardia is informed and believes and on that basis alleges that defendant CHV Partners Fund III, L.P. is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

11.    BioCardia is informed and believes and on that basis alleges that defendant CHV-

-3-

E Partners III, L.P. is a Massachusetts Limited Partnership with a place of business at 50 Braintree Hill Office Park Suite 301 Braintree, MA 02184, whose agent for service is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St. Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

12.     BioCardia is informed and believes and on that basis alleges that defendant Draper Associates Investments, LLC is a California Limited Liability Company with a place of business at 55 East Third Avenue, San Mateo, CA 94401, whose agent for service is Timothy Cook Draper, 55 East Third Avenue, San Mateo, CA 94401, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

13.     BioCardia is informed and believes and on that basis alleges that defendant Draper Associates Riskmaster Fund II, LLC is a California Limited Liability Company with a place of business at 55 East Third Avenue, San Mateo, CA 94401, whose agent for service is Timothy Cook Draper, 55 East Third Avenue, San Mateo, CA 94401, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

14.     BioCardia is informed and believes and on that basis alleges that defendant Draper Associates Riskmasters Fund III, LLC is a California Limited Liability Company with a place of business at 55 East Third Avenue, San Mateo, CA 94401, whose agent for service is Timothy Cook Draper, 55 East Third Avenue, San Mateo, CA 94401, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

15.     BioCardia is informed and believes and on that basis alleges that defendant Excelestar Ventures I, LLC is a Massachusetts Limited Liability Company with a place of business at 1 Elm Square, Andover, MA 01810, whose agent for service is Northwest Registered Agent Service, Inc. 8 The Green, Suite B Dover, DE 19901, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

16.     BioCardia is informed and believes and on that basis alleges that defendant eXXclaim Capital Partners I, LP  is a Delaware Limited Partnership with a place of business at 26010 Torello Ln., Los Altos, CA 94022, whose agent for service is Anula Jayasurtya 26010 Torello Ln., Los Altos, CA 94022, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

17.     BioCardia is informed and believes and on that basis alleges that defendant Fogarty Institute for Innovation  is a California Domestic non-profit company with a place of business at 2490 Hospital Dr., Suite 310, Mountain View, CA 94040, whose agent for service is Gaule Kuokka, 2490 Hospital Dr., Suite 310, Mountain View, CA 94040, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

18.     BioCardia is informed and believes and on that basis alleges that defendant Golden Seeds nVision Medical, LLC is a Delaware Limited Liability Company with a place of business at 1192 Cherry Ave, San Bruno, CA 94066, whose agent for service is Harvard Business Services, Inc., 16192 Coastal Hwy., Lewes, DE 19958, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

-5-

19.     BioCardia is informed and believes and on that basis alleges that defendant Life Sciences Angel Investors VIII, L.L.C. is a Delaware Limited Liability Company with a place of business at 1230 Bordeaux Dr., Sunnyvale, CA 94089, whose registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

20.     BioCardia is informed and believes and on that basis alleges that defendant LMNVC, LLC is a Delaware Limited Liability Company with a place of business at 407 E. Laurel Circle, Palm Springs, CA 92262, whose agent for service is Philip Nevinny-Stickel, 407 E. Laurel Circle, Palm Springs, CA 92262, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

21.     BioCardia is informed and believes and on that basis alleges that defendant Seraph nVision, LLC is a Georgia Limited Liability company with a place of business at 2011Lenox Road NE, Atlanta, GA 30306, whose Registered Agent is Tuff Yen 2011 Lenox Road NE, Atlanta, GA 30306, and is a former shareholder of nVision whose shares were acquired by Boston Scientific Corporation, 90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance.

## **JURISDICTION AND VENUE**

22.     BioCardia's complaint arises under the patent laws of the United States, 35 U.S.C. §§ 101 et seq., specifically 35 U.S.C. § 256, the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the laws of the State of California.

23.     This Court has subject matter jurisdiction over BioCardia's patent law claims under 28 U.S.C. §§ 1331 and 1338(a), jurisdiction over BioCardia's Defend Trade Secrets Act

-6-

1   claim under 28 U.S.C. § 1331 and has supplemental jurisdiction over BioCardia's state law

2   claims under 28 U.S.C. § 1367.

3       24.     This Court has general personal jurisdiction over Defendants because the acts out

4   of which this Action arises took place within this District.

5       25.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

6                           **INTRADISTRICT ASSIGNMENTS**

7       26.     Pursuant to Local Rule 3-2 (c), this case involves intellectual property rights and is

8   subject to assignment on a district wide basis.

9                              **FACTUAL BACKGROUND**

10      *Ms. Sarna's Employment Agreement with BioCardia*

11      27.     Ms. Sarna started consulting with BioCardia on September 15, 2008 pursuant to a

12  Consulting Agreement executed on August 27, 2008, and started as a full time employee of

13  BioCardia on November 3, 2008 pursuant to the BioCardia standard Employment Agreement

14  which she signed on October 29 (the "Sarna Agreement").  A true and correct copy of the Sarna

15  Agreement with Ms. Sarna's signature is attached hereto as **Exhibit A**.

16      28.     Ms. Sarna agreed in Section 3(b) of the Sarna Agreement to "promptly make full

17  written disclosure to the Company . . . and assign to the Company, or its designee, all my right,

18  title and interest in and to any and all inventions, original works of authorship, developments,

19  concepts, improvements or trade secrets" Ms. Sarna conceived of, developed or reduced to

20  practice during the time period Ms. Sarna was a BioCardia employee.  The only exception to Ms.

21  Sarna's contractual duty to assign to BioCardia provided by the Sarna Agreement is an invention

22  which comes entirely within California Labor Code Section 2870 ("Section 2870").

23      29.     In section 3(a) of the Sarna Agreement and in Exhibit A thereto, Ms. Sarna

24  represented that before starting work at BioCardia, she had no "inventions, original works of

25  authorship, developments, improvements, and trade secrets" made prior to her BioCardia

26  employment "which relate to the Company's proposed business, products or research and

27  development, and which are not assigned to the Company hereunder."  When Ms. Sarna left

28  BioCardia in January 2012, Ms. Sarna expressly represented to BioCardia in writing that Ms.

Sarna did not have any invention to disclose to BioCardia and had made no invention which was assigned to BioCardia pursuant to the Sarna Agreement.

30.     In or around January 2019, BioCardia learned that on January 25, 2011, while a BioCardia employee and a year before Ms. Sarna left BioCardia, Ms. Sarna filed U.S. Provisional application No. 61/435,945 (the "'945 Provisional Application"), which issued as U.S. Patent No. 9,173,571 (the "'571 Patent") on November 3, 2015.

31.     The circumstances of BioCardia's discovery of its claims were that on December 21, 2018, Boston Scientific advised BioCardia's Dr. Altman that it no longer wanted to pursue a business relationship with BioCardia that previously had been under discussion.  Dr. Altman knew that Ms. Sarna was CEO of a company, which Boston Scientific recently had acquired.  To understand why Boston Scientific acquired Ms. Sarna's company, when it was not interested in doing a deal with BioCardia, Dr. Altman searched the USPTO website to see whether Ms. Sarna had filed any patents or patent applications which might explain why Boston Scientific was interested in acquiring her company but not interested in pursuing a relationship with BioCardia. Dr. Altman was surprised to learn from his search that Ms. Sarna and her company, nVision, were doing what had been disclosed confidentially to Ms. Sarna during her employment at BioCardia. Dr. Altman was even more surprised to discover that nVision's patent applications had been applied for by Ms. Sarna while she was a BioCardia employee.

32.     BioCardia subsequently learned that Ms. Sarna also filed three other published applications claiming priority to the '945 Provisional Application, including US 2014/0323859 published on October 30, 2014, US 2016/151001 published June 2, 2017, and US 15/605,407 published September 14, 2017 (collectively, with the '945 Provisional Application and the '571 Patent, the "'945 Provisional Family").

33.     BioCardia later learned that while a BioCardia employee, Ms. Sama also filed Provisional Patent Application No. 61/559120 on November 13, 2011 entitled "Device and method to confirm occlusion of the fallopian tube" (the "'120 Provisional Application"), and that Ms. Sarna subsequently filed Application No, 14/357,875, which claimed priority to the '120 Provisional and which published on October 30, 2014 as US2014/0323859 (collectively the "'120

-8-

1  Provisional Family").

2      34.     On November 7, 2013, Surbhi Sarna's U.S. Application No. 13/979,691 published

3  as US 2013/0296686, which claims priority to U.S. Provisional Application No. 61/435,945, filed

4  on January 25, 2011 by Ms. Sarna while she was employed by BioCardia (the "'691

5  Application").

6      35.     On June 2, 2016, nVision's U.S. Application No. 14/929,989 published as US

7  2016/0151011, which claims priority to, among others, U.S. Provisional Application No.

8  61/435,945, filed on January 25, 2011 by Ms. Sarna while she was employed by BioCardia (the

9  "'989 Application").  The '989 Application issued as U.S. Patent No. 10,610,149 on April 7,

10  2020 (the "'149 Patent").

11      36.     On September 14, 2017, nVision's U.S. Application No. 15/605,407 published as

12  US 2017/0258392, which claims priority to, among others, U.S. Provisional Application No.

13  61/435,945, filed on January 25, 2011 by Ms. Sarna while she was employed by BioCardia (the

14  "'407 Application").

15      37.     The '945 Provisional Family, the '120 Provisional Family, the '691 Application,

16  the '149 Patent and the '407 Application will be collectively referred to as the "Sarna Patent

17  Family."

18      38.     BioCardia had no reason to discover the Sarna Patent Family since it had no

19  reason to search for patents or patent applications on which Ms. Sarna was a claimed inventor to

20  determine if they claimed priority to a date when Ms. Sarna was employed by BioCardia.

21      39.     The inventions claimed in the Sarna Patent Family (the "Sarna Patent Family

22  Inventions") were conceived of by Ms. Sarna while a BioCardia employee.

23      40.     The Sarna Patent Family Inventions claimed in the Sarna Patent Family are

24  covered by Ms. Sarna's assignment obligation in the Sarna Agreement because as a matter of law

25  they do not come within the Section 2870 exception to Ms. Sarna's obligation to assign them to

26  BioCardia.

27      41.     BioCardia is informed and believes and on that basis alleges that Ms. Sarna

28  apparently was working on the Sarna Patent Family Inventions during BioCardia working hours.

-9-

In fact, Ms. Sarna was reprimanded for not showing up during working hours, which reprimands were documented in writing at least three times in writing on February 2011, July 2011, and December 2011 (she was also reprimanded verbally for similar infractions at different times), which BioCardia now is informed and believes and on that basis alleges that, among other times, she was working on the Sarna Parent Family Inventions instead of what she was being paid to do by BioCardia, making them outside of the Section 2870 exemption from Ms. Sarna's assignment obligation as a matter of law.

*Labor Code Section 2870 Does Not Exempt the Sarna Patent Family Inventions from Assignment*

42.     Under Section 2870, the Sarna Patent Family Inventions were exempted from assignment by Section 2870 *only if both* (1) the Sarna Patent Family Inventions were made wholly on Ms. Sarna's own time and *in addition* (2) the Sarna Patent Family Inventions (a) neither related to BioCardia's business or actual or demonstrably anticipated research or development at the time of invention nor (b) resulted from any work Ms. Sarna performed for BioCardia.

43.     California Labor Code Section 2872 puts the burden of proof squarely on Ms. Sarna to prove that the Sarna Patent Family Invention(s) comes within the Section 2870 prohibition against assignment: " In any suit or action arising thereunder [Section 2870], the burden of proof shall be on the employee claiming the benefits of its provisions."

*The Sarna Patent Family Inventions Are Related to BioCardia's "Demonstrably Anticipated Research or Development at the Time of Invention."*

44.     What Ms. Sarna claimed to have invented in the Sarna Patent Family was actually disclosed to Ms. Sarna by Dr. Peter Altman, BioCardia's President and CEO, in a meeting in Dr. Altman's BioCardia office in what is believed to be 2010.  In particular, Dr. Altman showed to Ms. Sarna at least pages 74-76 of BioCardia Lab Notebook No. 21 signed and dated March 23, 2000 (the "Lab Notebook").  The Lab Notebook demonstrates that the Sarna Patent Family Inventions related to BioCardia's business and even more clearly, to its demonstrably anticipated research or development, at the time of their purported invention.  The Lab Notebook also

1  constituted trade secrets of BioCardia (the "Lab Notebook Trade Secrets").

2  45.  Dr. Altman discussed the potential for early diagnostic and local therapy for

3  ovarian cancer with Ms. Sarna because BioCardia anticipated research regarding the ovarian

4  diagnostic/ therapy approach detailed in the Lab Notebook.  Without early diagnosis, local

5  therapy for the treatment of ovarian cancer becomes irrelevant because of metastasis.  This

6  concept underlines why BioCardia's core efforts in local biologic therapy require pre metastasis

7  diagnostics to identify the disease state (the "BioCardia Additional Disclosures").

8  46.  BioCardia intended that Ms. Sarna herself was going to conduct that research,

9  which is why Dr. Altman disclosed the Lab Notebook to her.  That is also why Dr. Altman made

10  the BioCardia Additional Disclosures and shared additional laboratory notebook pages with her in

11  the same meeting session relating to the potential ramifications of early diagnosis and the

12  potential for local therapy.  The images in the Lab Notebook clearly show BioCardia Morph and

13  Helix products being purposed for fallopian tube based procedures being performed through the

14  uterus.  These are two products on which Ms. Sarna worked on a daily basis.  Further, at least

15  three other employees of BioCardia were aware that Dr. Altman had spent time with Ms. Sarna

16  proposing that she work on a women's health project.

17  47.  BioCardia has detailed publicly its interest in intrauterine procedures in a number

18  of patents issued for its Morph product offerings.  These include U.S. Patent No. 9,078,994 on a

19  method of accessing a contralateral femoral artery of a patient; U.S. Patent No. 9,022,977 on a

20  method of accessing a renal artery of a patient; U.S. Patent No. 9,017,284 on a method of

21  implanting a PFO occluder in a patient; U.S. Patent No. 9,011,373 on a method of accessing a

22  carotid artery of a patient; U.S. Patent No. 8,939,960 on a steerable guide catheters and methods

23  for their use; and U.S. Patent No. 7,402,151 on a Steerable guide catheters and methods for their

24  use.  The patent specifications expressly state (emphasis added) that:

> [o]ther applications of this thin walled steerable guide and sheath guide invention
> include transjugular intrahepatic portosystemic (TIPS) shunt placement, **uterine
> fibroid biopsy and ablation**, trans atrial septal delivery and manipulation of
> devices (for pulmonary vein ablation, implantation and or recovery of devices in the
> left atrial appendage and performing antegrade mitral and aortic valve
> manipulations and artificial valve implantation), and also for neurological access
> and delivery of coils and stents.

-11-

48.     BioCardia also disclosed publicly its interest in local therapy for the treatment of cancer, which has been noted would require early diagnosis to make sense.

49.     On September 10, 2013, BioCardia's U.S. Patent No. 8,529,550 (the "'550 patent") issued with claims related to the potential of local catheter based therapy for cancer that include broad claims on the leading blockbuster agents that were approved for cancer at that time. The primary independent issued patent claim awarded was for:

> A catheter system comprising: a catheter having a proximal end and a distal end; a drug delivery structure disposed on the distal end of the catheter, where the structure is a hollow structure with one or more apertures communicating from the interior to the exterior of said hollow structure, and a reservoir of a therapeutic agent within said drug delivery structure, said therapeutic agent comprising one of antagonists to angiogenic agents, cytotoxic agents, anti-Her-2, and anti CD20, and tumor necrosis factors; said drug delivery structure being disengageable from the distal end of the catheter; a mechanism at the proximal end of the catheter for disengaging said drug delivery structure from the distal end of the catheter; and a fixation means on said drug delivery structure that may be used within a body of a patient to implant the drug delivery structure to a depth within an intended tissue within the body of a patient.

50.     BioCardia privately had a number of conversations with senior executives at other institutions regarding its interests in local biotherapeutic delivery for ovarian cancer.  At least two of these are documented in emails.

51.     On September 11, 2013, the day after the '550 patent issued, BioCardia's CEO reached out via email to a colleague at Genentech involved with the commercial development of Avastin, possibly the world's most valuable drug for the treatment of cancer by revenue that is described broadly in the '550 patent, alerting him that the '550 patent had issued and that BioCardia "can also enable local delivery of therapeutic agents with ease into the ovary."

52.     Separately, BioCardia's CEO reached out to a research scientist at one of the world's leading cancer institutes, MD Anderson in Houston, to the same effect.

***The '571 Patent Itself Discloses That It Is Related to BioCardia's Actual Business***

53.     Coronary artery disease was and is a primary focus of BioCardia's business.  The '571 Patent's specific reference to the use of the invention for coronary arteries proves that the '571 Invention related not only to BioCardia's reasonably anticipated research but also to its core business.  The specification states that:

-12-

> Although illustrative embodiments of this invention have been shown and described, other modifications, changes, and substitutions are intended. By way of example, the present invention discloses fallopian tubes as an exemplar of a narrow body lumen, which may undergo maintenance, and other anatomical structures, such as **coronary arteries**, may be similarly maintained.  Accordingly, it is appropriate that the appended claims be construed broadly and in a manner consistent with the scope of the disclosure as set forth in the following claims.

'571 Patent at 16:30-39 (emphasis supplied).

### *Misappropriation of Trade Secrets*

54.    The Lab Notebook also contains what are clearly BioCardia trade secrets, making Ms. Sarna's filing U.S. Provisional application No. 61/435,945 and the other members of the Sarna Patent Family also a misappropriation of trade secrets under California law.

55.    The BioCardia Additional Disclosures are clearly BioCardia trade secrets ("the Additional Trade Secrets"), making their use and disclosure also a misappropriation of trade secrets under California law.

56.    The Lab Notebook Trade Secrets and the BioCardia Additional Trade Secrets will be collectively referred to herein as the "BioCardia Trade Secrets."

57.    BioCardia is informed and believes and on that basis alleges that the following table identifies the BioCardia Additional Trade Secrets and evidence currently known to BioCardia and where such information was used or disclosed by nVision:

| | Trade secret | Where used or disclosed by nVision based on limited information available to date |
|---|---|---|
| 1 | Diagnostic method of using a catheter inserted into a fallopian tube to obtain a solid or liquid biopsy of potentially diseased ovarian tissue or cells, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter and obtaining a sample of tissue through the second catheter that is from the ovary which may be analyzed biologically. | 20190126010, SYSTEMS, METHODS, AND DEVICES FOR DELIVERING SUBSTANCES INTO A FALLOPIAN TUBE<br><br>20190125318, CELL COLLECTION AND PREPARATION DEVICES AND METHODS<br><br>20190000429, Systems, Methods, and Devices for Fallopian Tube Diagnostics<br><br>20180353161, Systems, methods, and devices for fallopian tube diagnostics<br><br>20170258392, Apparatus and Processes for Operating on a Narrow |

-13-

| | | |
|---|---|---|
| | | Body Lumen<br><br>20160278747, METHODS AND DEVICES FOR FALLOPIAN TUBE DIAGNOSTICS |
| 2 | Diagnostic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and sampling for biologic analysis. | 20130296686, Systems and Methods for Maintaining a Narrow Body Lumen<br><br>201601510113 Systems and Methods for Maintaining a Narrow Body Lumen<br><br>20190126010, SYSTEMS, METHODS, AND DEVICES FOR DELIVERING SUBSTANCES INTO A FALLOPIAN TUBE<br><br>20190125318, CELL COLLECTION AND PREPARATION DEVICES AND METHODS<br><br>20190000429, Systems, Methods, and Devices for Fallopian Tube Diagnostics<br><br>20180353161, Systems, methods, and devices for fallopian tube diagnostics<br><br>20170258392, Apparatus and Processes for Operating on a Narrow Body Lumen<br><br>20160278747, METHODS AND DEVICES FOR FALLOPIAN TUBE DIAGNOSTICS |
| 3 | Diagnostic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with rotational ultrasound imaging to enable navigation and sampling for biologic analysis. | 20130296686 Systems and Methods for Maintaining a Narrow Body Lumen<br><br>20140323859 DEVICE AND PROCESS TO CONFIRM OCCLUSION OF THE FALLOPIAN TUBE<br><br>201601510113 Systems and Methods for Maintaining a Narrow Body Lumen<br><br>20130296686, Systems and Methods for Maintaining a Narrow Body Lumen |

-14-

| | | |
|---|---|---|
| | | 20140323859, DEVICE AND PROCESS TO CONFIRM OCCLUSION OF THE FALLOPIAN TUBE |
| | | 201601510113 Systems and Methods for Maintaining a Narrow Body Lumen |
| | | 20190126010, SYSTEMS, METHODS, AND DEVICES FOR DELIVERING SUBSTANCES INTO A FALLOPIAN TUBE |
| | | 20190125318, CELL COLLECTION AND PREPARATION DEVICES AND METHODS |
| | | 20190000429, Systems, Methods, and Devices for Fallopian Tube Diagnostics |
| | | 20180353161, Systems, methods, and devices for fallopian tube diagnostics |
| | | 20170258392, Apparatus and Processes for Operating on a Narrow Body Lumen |
| | | 20160278747, METHODS AND DEVICES FOR FALLOPIAN TUBE DIAGNOSTICS |
| 4 | Diagnostic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of ovarian cysts or tumors. | 20130296686, Systems and Methods for Maintaining a Narrow Body Lumen |
| | | 20140323859, DEVICE AND PROCESS TO CONFIRM OCCLUSION OF THE FALLOPIAN TUBE |
| | | 201601510113 Systems and Methods for Maintaining a Narrow Body Lumen |
| 5 | Diagnostic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with rotational ultrasound imaging to enable navigation and imaging of ovarian cysts or | 20130296686 Systems and Methods for Maintaining a Narrow Body Lumen |
| | | 20140323859 DEVICE AND PROCESS TO CONFIRM OCCLUSION OF THE FALLOPIAN TUBE |

-15-

| | | | |
|---|---|---|---|
| | | tumors. | 20160151011 Systems and Methods for Maintaining a Narrow Body Lumen |
| | 6 | Diagnostic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors. | 20130296686 Systems and Methods for Maintaining a Narrow Body Lumen<br><br>20140323859 DEVICE AND PROCESS TO CONFIRM OCCLUSION OF THE FALLOPIAN TUBE<br><br>20160151011 Systems and Methods for Maintaining a Narrow Body Lumen |
| | 7 | Diagnostic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with rotational ultrasound imaging to enable navigation and imaging of ovarian cysts or tumors and to take an action selected from the set of (1) characterizing said cyst or said tumor or (2) planning therapeutic intervention of said cysts and said tumors. | 20130296686 Systems and Methods for Maintaining a Narrow Body Lumen<br><br>20140323859 DEVICE AND PROCESS TO CONFIRM OCCLUSION OF THE FALLOPIAN TUBE<br><br>20160151011 Systems and Methods for Maintaining a Narrow Body Lumen |
| | 8 | Diagnostic method and devices to be used through a fallopian tube to advance a penetrating element into the ovary to take a solid or fluid tissue sample, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a penetrating element through the guide catheter and advancing the penetrating element into the ovary to obtain a liquid or solid sample for biologic analysis. | |
| | 9 | Diagnostic method and devices to be used through a fallopian tube to advance a penetrating element into the ovary to take a solid or fluid tissue sample, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a penetrating element through the guide catheter and advancing the penetrating element consisting of a hollow | |

| | | |
|---|---|---|
| | helical needle into the ovary to obtain a liquid or solid sample for biologic analysis. | |
| 10 | Diagnostic method and devices to be used through a fallopian tube to advance a penetrating element into the ovary to take a solid or fluid tissue sample, the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system having a penetrating element through the guide catheter and advancing the penetrating element consisting of a straight needle into the ovary to obtain a liquid or solid sample for biologic analysis. | |
| 11 | Therapeutic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube to advance a therapy, the specific method consisting of the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) ablating regions of the ovary, (2) delivering controlled release drug delivery matrices to relevant tissue in and around the ovary, or (3) draining the tissue mass penetrated by the hollow penetrating element. | |
| 12 | Therapeutic method of inserting a catheter with imaging, such as ultrasound imaging, on its distal end into a fallopian tube to advance a therapy, the specific method consisting of the specific method consisting of advancing a guide catheter into the uterus to gain access to the ostium of a fallopian tube, advancing a second catheter system through the guide catheter with ultrasound imaging, to enable navigation and imaging of an ovarian cyst or tumor, and to take an action selected from the set of (1) ablating regions of the ovary using radiofrequency energy or (2) ablating the regions of the ovary by the delivery of alcohol. | |
| 13 | Catheter system which includes a distal spring element on its end and having a round spherical ball mounted on the spring to avoid damage to the lumen through which it is passed, the specific system consisting of a catheter shaft having a hollow lumen, containing a fluid conduit, which passes through a helical metal | 2019/0126010 Systems Methods and Devices for Delivering Substances Into Fallopian Tube. |

-17-

| | | |
|---|---|---|
| | spring on its distal end attached to a small ball attached to the distal most end. | |
| 14 | Therapeutic method and devices to be used through the vagina, uterus, and  fallopian tube to advance a hollow penetrating element from a catheter into the ovary to drain a cyst, wherein the hollow penetrating element is connected to a fluid conduit within the catheter system that is connected to a reservoir outside of the body. | |
| 15 | Device design and method of use for a "sweet tip"  sugarcoating to cover a sharper penetrating element on a catheter system for advancement through a distal fallopian tube, the specific design and method consisting of having the distal tip dissolve within the secretions of the fallopian tube after positioned for penetration to expose a distal sharp penetrating element over time. | |
| 16 | Therapeutic strategy for ovary removal if identified as precancerous based on a diagnosis performed from a locally obtained sample before evidence of metastasis have appeared, the specific strategy consisting of obtaining a local biological sample derived from the ovary or adjacent fluids, to determine that the ovary has a significant possibility of having a malignant cancer, and using this information to make the clinical decision to perform either unilateral or bilateral oophorectomy. | 20190126010, SYSTEMS, METHODS, AND DEVICES FOR DELIVERING SUBSTANCES INTO A FALLOPIAN TUBE<br><br>20190125318, CELL COLLECTION AND PREPARATION DEVICES AND METHODS<br><br>20190000429, Systems, Methods, and Devices for Fallopian Tube Diagnostics<br><br>20180353161, Systems, methods, and devices for fallopian tube diagnostics<br><br>20170258392, Apparatus and Processes for Operating on a Narrow Body Lumen<br><br>20160278747, METHODS AND DEVICES FOR FALLOPIAN TUBE DIAGNOSTICS |
| 17 | Therapeutic strategy for delivering ablative compounds such as alcohol or ablative energy through a catheter system passed through a vagina, uterus, and fallopian tubes to treat disease or a condition of the ovary in which a penetrating element is advanced into the ovary. | |
| 18 | The existence of a market need to improve the ability to diagnose pre-cancerous and cancerous cysts minimally invasively with details on the ramifications for therapy with early diagnosis, | 20190126010, SYSTEMS, METHODS, AND DEVICES FOR DELIVERING SUBSTANCES INTO A FALLOPIAN TUBE |

-18-

| | | | |
|---|---|---|---|
| 1 2 3 4 5 6 7 8 9 10 | | and strategies for doing so that align with new biological measurement technologies in gene expression and genetic analysis that enable a small sample to identify the presence of disease, including details on the players in the gene diagnosis space looking at blood (CareDx), solid tumor tissues (Genomic health), and cells sloughing from within a body lumen conduit such as  that of a bowel movement which passes through the colon (EXACT Sciences). | 20190125318, CELL COLLECTION AND PREPARATION DEVICES AND METHODS<br><br>20190000429, Systems, Methods, and Devices for Fallopian Tube Diagnostics<br><br>20180353161, Systems, methods, and devices for fallopian tube diagnostics<br><br>20170258392, Apparatus and Processes for Operating on a Narrow Body Lumen<br><br>20160278747, METHODS AND DEVICES FOR FALLOPIAN TUBE DIAGNOSTICS |
| 11 12 13 | 19 | BioCardia template documents sent to Ms. Sarna's personal email account, consisting of the following templates: Risk Analysis, Product Specification, Labelling Verification,  and Document Change Order procedures. | . |

58.  Moreover, in or about April 2019 BioCardia discovered that Ms. Sarna emailed to her personal email address a large number of BioCardia confidential documents, starting at least as early as April 29, 2009 and continuing at least through December 19, 2011, less than a month before her departure from BioCardia.

59.  Although BioCardia does not know at this point why Ms. Sarna emailed the identified documents to her personal email, upon information and belief, these emails suggest that she may have used BioCardia confidential information for her own purposes.  Discovery may result in additional claims relating to these emailed documents.

60.  The BioCardia Trade Secrets were the subject of reasonable efforts at secrecy, including but not limited to requiring all employees to execute the BioCardia standard Employment Agreement in the same form as the Sarna Agreement attached hereto as **Exhibit A**, and restricting access to BioCardia's information to employees who have executed the BioCardia standard Employment Agreement and by restricting access to BioCardia's facilities to employees who had signed the standard Employment Agreement and to visitors who are escorted by

-19-

someone who had signed the standard Employment Agreement.

### The Statute of Limitations

61.    Although Ms. Sarna's wrongful acts occurred more than eight years ago, they were discovered no earlier than January 2019.  Since an employer is under no duty to search for breaches of assignment agreements by former employees, there is no statute of limitations issue.

### The Statute of Limitations for Breach of Contract Has Not Run

62.    While the statute of limitations for breach of contract is four years from breach, the limitations period for a breach of contract done in secret resulting in harm that is not reasonably discoverable, as was Ms. Sarna's breach of the Sarna Agreement, does not begin to run until the breach was or reasonably should have been discovered.  *See, e.g., April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 827, 831 (1983).

### The Statute of Limitations for Breach of the Assignment of Inventions Has Not Run

63.    Ms. Sarna's assignment of inventions she would make during her employment at BioCardia is considered an automatic assignment of a right in a future interest. *DDB Techs v. MLB Advanced Media LP,* 517 F.3d 1284, 1290 (Fed.Cir.2008).

64.    The breach occurred only when Ms. Sarna refused to assign the '571 Inventions after BioCardia demanded assignment.  *See*, *e.g.*, *General Elec. Co. v. Wilkins*, 2012 WL 3778865, *16 (E.D. Ca. Aug. 31, 2012); Imatec, Ltd. v Apple Computer, Inc*., 81 F.Supp.2d 471, 483 n.5 (S.D.N.Y. 2000); *Goldwasser v. Smith Corona Corp*., 817. F.Supp. 263, 271-72 (D. Conn. 1994), aff'd, 26 F.3d 137 (Fed. Cir. 1994).  This did not happen until April 9, 2019 at the earliest, when BioCardia sent a letter to Ms. Sarna based on BioCardia's discovery in January 2019 that there was something for which to demand assignment.

65.    It is well settled that the four-year California statute of limitations for breach of an automatic assignment does not begin to run until the former employer learned or should have learned of the breach.  In the context of breach of an automatic assignment agreement, the discovery rule "'postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action.'"  *Target Technology Co. v. Williams Advanced Materials, Inc.*, 2008 WL 5002935, *12 (C.D. Cal 2008), *quoting Nogart v. The Upjohn Company*, 21 Cal. 4th

-20-

383, 397 (1999).  Again in the context of breach of an automatic assignment agreement, "[t]he statutory limitations period for a breach of contract commences when the party wronged knows, or reasonably should know of the breach."  *Gen Elec. Co.* at *15, *quoting Jaffe v. Carroll*, 35 Cal.App.3d 53, 58059 (1973).

### *The Statute of Limitations for Misappropriation of Trade Secrets Has Not Run*

66.     The statute of limitations on a trade secret claim runs from the date on which the claim was or reasonably should have been discovered.  California Civil Code § 3426.6.  BioCardia had no reason to suspect a misappropriation until it found the '571 Patent in January 2019.

### *Laches Does Not Apply to BioCardia's Claim for Correction of Inventorship*

67.     There is no statute of limitations as such with respect to correction of inventorship; claims for correction of inventorship can only be barred by laches.  There is a presumption against laches if the claim is brought within six years of the ***later*** of discovery of the claim or issuance of the patent to be corrected.  *Pei-Herng Hor v. Ching-Wu Chu*, 699 F.3d 1331, 1335 (Fed. Cir. 2012).  Here the correction of inventorship claim did not accrue until earlier this year, so there is no laches issue.

### *Fraudulent Concealment Tolled the Statute of Limitations*

68.     Ms. Sarna agreed in Section 3(f) of the Sarna Agreement that "I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A."  The Termination Certificate Ms. Sarna was contractually obligated to sign and did sign on her January 4, 2012 departure from BioCardia did not disclose the inventions claimed in the '945 Provisional Application and the '120 Provisional Application, which she was obligated to do even if she believed them outside her automatic assignment obligation because of Section 2870.  Ms. Sarna thus fraudulently concealed U.S. Provisional application No. 61/435,945 from BioCardia.

69.     Thus, even if there were otherwise some duty by BioCardia to have investigated Ms. Sarna's breach of her automatic assignment obligation, which there was not, her fraudulent concealment of the Sarna Patent Family Inventions excused any failure to discover her breach.

-21-

*Target Technology, Inc.*, 2008 WL 5002935 at * 13, *citing USA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir. 1994).

### nVision Is Chargeable with Sarna's Wrongful Acts

70.     nVision was directly and primarily liable for its own misappropriations of BioCardia's trade secrets and secondarily liable for Ms. Sarna's misappropriation of BioCardia's trade secrets under the doctrine of respondeat superior because Ms. Sarna, as the president and founder of nVision, was acting within the course and scope of her employment in committing the acts of misappropriation as herein alleged. *See, e.g., In re Energy Securities Litigation*, No. 15-cv-00265-EMC, 2016 WL 324150, *25 (N.D. Cal. Jan 27, 2016).

### Imposition of a Constructive Trust Against nVision Is Proper Even if It Engaged in no Wrongdoing

71.     Imposition of a constructive trust against nVision is appropriate even if it did not itself commit a wrongful act because under California law "the remedy of a constructive trust does not require that the person currently holding the property committed any wrongful act in obtaining the property, only that the property at issue was wrongfully gained, even if by accident or mistake." *Carpenters Local Union 271 v. Griggs*, CV-17-4460 DSF (MRWx), 2018 WL. 6003577, *3 (C.D. Cal. Nov. 5, 2018), *citing In re Advent Management Corp.*, 104 F.3d 293, 295 (1997).

### Imposition of a Constructive Trust Against the Shareholders Defendants Is Proper Even if They Engaged in no Wrongdoing

72.     Imposition of a constructive trust against the Shareholder Defendants is appropriate even if they did not commit a wrongful act because the amount Boston Scientific Corporation paid them for their nVision shares at least partially resulted from Ms. Sarna's and nVision's wrongful conduct.  Under California law, "the remedy of a constructive trust does not require that the person currently holding the property committed any wrongful act in obtaining the property, only that the property at issue was wrongfully gained, even if by accident or mistake." *Carpenters Local Union 271 v. Griggs*, CV-17-4460 DSF (MRWx), 2018 WL. 6003577, *3 (C.D. Cal. Nov. 5, 2018), *citing In re Advent Management Corp.*, 104 F.3d 293, 295

(1997).

## COUNT I
### (Correction of Inventorship under 35 U.S.C. § 256)
### (Against Defendant nVision)

73.     BioCardia realleges paragraphs 1-72, inclusive.

74.     BioCardia is informed and believes and on that basis alleges that Dr. Altman and Dr. Stertzer are at least co-inventors of at least of at least claim 1 of the '571 Patent because they conceived or at least contributed to the conception of the highlighted portions of claim 1:

> A device for maintaining a narrow body lumen, comprising: a hydraulic propulsion mechanism and at least one of an imaging portion or a therapeutic portion, said hydraulic propulsion mechanism configured for propelling said imaging portion or said therapeutic portion relative to said hydraulic propulsion mechanism and through the narrow body lumen, said hydraulic propulsion mechanism including an elongate shaft, wherein the narrow body lumen is distal of a distal end of said elongated shaft; wherein said imaging portion or said therapeutic portion, when propelled by said hydraulic propulsion mechanism, is driven distally from said distal end of said elongated shaft and is distally spaced therefrom; and a retrieval mechanism for retrieving said imaging portion or said therapeutic portion from the narrow body lumen.

75.     BioCardia is informed and believes and on that basis alleges that Dr. Altman and Dr. Stertzer may be at least co-inventors of at least one claim in other patent applications in the Sarna Patent Family, depending on which claims issue on each application, and may seek leave to amend to seek correction of inventorship of any patent issuing with claims on which Dr. Altman and Dr. Stertzer are omitted inventors.

76.     BioCardia is informed and believes and on that basis alleges that Dr. Altman and Dr. Stertzer are omitted inventors on the '571 Patent and may be omitted inventors on patent applications in the Sarna Patent Family.

77.     BioCardia is informed and believes and on that basis alleges that the omission of Dr. Altman and Dr. Stertzer as inventors was the result of error.

78.     BioCardia is informed and believes and on that basis alleges that the omission of Dr. Altman and Dr. Stertzer as inventors was made without deceptive intent.

79.     BioCardia has standing to seek correction of inventorship because Dr. Altman and Dr. Stertzer each assigned to BioCardia all of their right, title and interest in and to all inventions

they made at BioCardia, and all resulting patents, through their execution of the BioCardia standard Employment Agreement in the same form as the Sarna Agreement attached hereto as **Exhibit A.**

80.     BioCardia requests correction of inventorship of the '571 Patent to name Dr. Peter Altman and Dr. Simon Stertzer as co-inventors.

<u>**COUNT II**</u>
**(Imposition of Constructive Trust Based on Unjust Enrichment)**
**(Against All Defendants)**

81.     BioCardia realleges paragraphs 1-72, inclusive.

82.     The Sarna Agreement is a valid and enforceable contract with BioCardia.

83.     BioCardia has duly performed all conditions, covenants, and promises required on its part to be performed pursuant to the Sarna Agreement.

84.     Ms. Sarna breached her contractual obligations to BioCardia under the Sarna Agreement by, *inter alia*, failing to disclose to and assign to BioCardia each of the patents and patent applications in the Sarna Patent Family.

85.     As a direct and proximate result of Ms. Sarna's breaches of the Sarna Agreement, BioCardia has incurred and continues to incur damages in an amount according to proof.

86.     BioCardia also seeks specific performance of Ms. Sarna's obligation to assign to BioCardia each of the patents and patent applications to the extent nVision is presently the owner of any of the patents and patent applications in the Sarna Patent Family.

87.     BioCardia is informed and believes and on that basis alleges that Defendant nVision was unjustly enriched by having wrongfully detained and/or gained legal title to each of the patents and patent applications in the Sarna Patent Family within the meaning of California Civil Code §§ 2223 and/or 2224 as a proximate result of Ms. Sarna's breach of contract as herein alleged and accordingly BioCardia seeks imposition of a constructive trust on the Sarna Patent Family.

88.     BioCardia also seeks imposition of a constructive trust against the Shareholder Defendants for the benefit of BioCardia in the amount of their unjust enrichment based on how much Boston Scientific Corporation paid them for their nVision shares resulting from Ms. Sarna's and nVision's wrongful conduct as herein alleged.

**COUNT III**

**(Misappropriation of Trade Secrets under California Uniform Trade Secrets Act Under
California Civil Code Sections 3426 et seq
(Against nVision and Imposition of Constructive  Trust Against All Defendants Based on
Their Unjust Enrichment)**

89.     BioCardia realleges paragraphs 1-72, inclusive.

90.     BioCardia derived independent economic value from the BioCardia Trade Secrets not being known to the public or other persons who could obtain economic value from their disclosure or use.

91.     The BioCardia Trade Secrets were subject to efforts that are reasonable under the circumstances to maintain their secrecy as herein alleged.

92.     Defendant nVision misappropriated the BioCardia Trade Secrets by disclosing and/or using such information to apply for the Sarna Patent Family Inventions and to make the purported inventions claimed in the Sarna Patent Family without BioCardia's consent, and using the BioCardia Trade Secrets as alleged in paragraphs 54-57, above.

93.     Defendant nVision took advantage of the misappropriated BioCardia Trade Secrets by having Ms. Sarna disclose and/or use such information for the advancement and benefit of nVision despite being aware of Ms. Sarna's duties and obligations to BioCardia to limit the disclosure and use of such information only for the benefit of BioCardia and that such disclosure was in violation of the Sarna Agreement.

94.     In addition, Defendant nVision is secondarily liable for Ms. Sarna's misappropriation of BioCardia's trade secrets under the doctrine of respondeat superior because Ms. Sarna, as the president and founder of nVision, was acting within the course and scope of her employment in committing the acts of misappropriation as herein alleged. *See, e.g., In re Energy Securities Litigation*, No. 15-cv-00265-EMC, 2016 WL 324150, *25 (N.D. Cal. Jan 27, 2016).

95.     As a direct and proximate result of Defendant nVision's misappropriation of the BioCardia Trade Secrets, BioCardia has incurred and continues to incur damages in an amount according to proof.

-25-

96.     Defendant nVision's misappropriation of the BioCardia Trade Secrets was willful and malicious and thereby entitles BioCardia to an award of exemplary damages.

97.     Defendant nVision was unjustly enriched by having wrongfully detained and/or gained legal title to each of the patents and patent applications in the Sarna Patent Family within the meaning of California Civil Code §§ 2223 and/or 2224 as a proximate result of the misappropriation of trade secrets as herein alleged, and accordingly BioCardia seeks imposition of a constructive trust on the Sarna Patent Family and any other fruits of the misappropriation of the BioCardia Trade Secrets.

98.     BioCardia also seeks imposition of a constructive trust against the Shareholder Defendants for the benefit of BioCardia in the amount of their unjust enrichment based on how much Boston Scientific Corporation paid them for their nVision shares resulting from Ms. Sarna's and nVision's wrongful conduct as herein alleged.

## COUNT IV

**(Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836)**
**(Against nVision and Imposition of Constructive Trust Against All Defendants)**

99.     BioCardia realleges paragraphs 1-72, inclusive.

100.    The Defend Trade Secrets Act, 18 U.S.C. § 1836, applies because at least some of the acts of misappropriation, including at least the disclosure or use of the BioCardia Trade Secrets, occurred after the May 11, 2016 effective date of the Act.

101.    BioCardia derived independent economic value from the BioCardia Trade Secrets not being known to the public or other persons who could obtain economic value from their disclosure or use.

102.    The BioCardia Trade Secrets were subject to efforts that are reasonable under the circumstances to maintain their secrecy as herein alleged.

103.    Defendant nVision misappropriated the BioCardia Trade Secrets by disclosing and/or using such information to apply for the Sarna Patent Family Inventions and to make the purported inventions claimed in the Sarna Patent Family without BioCardia's consent, and using

-26-

1    the BioCardia Trade Secrets as alleged in paragraphs 54-57, above.

2          104.    Defendant nVision took advantage of the misappropriated BioCardia Trade Secrets

3    by having Ms. Sarna disclose and/or use such information for the advancement and benefit of

4    nVision despite being aware of Ms. Sarna's duties and obligations to BioCardia to limit the

5    disclosure and use of such information only for the benefit of BioCardia and that such disclosure

6    was in violation of the Sarna Agreement.

7          105.    In   addition,   Defendant   nVision   is   secondarily   liable   for   Ms.   Sarna's

8    misappropriation of BioCardia's trade secrets under the doctrine of respondeat superior because

9    Ms. Sarna, as the president and founder of nVision, was acting within the course and scope of her

10   employment in committing the acts of misappropriation as herein alleged.  *See, e.g., In re Energy*

11   *Securities Litigation*, No. 15-cv-00265-EMC, 2016 WL 324150, *25 (N.D. Cal. Jan 27, 2016).

12         106.    As a direct and proximate result of Defendant nVision's misappropriation of the

13   BioCardia Trade Secrets, BioCardia has incurred and continues to incur damages in an amount

14   according to proof.

15         107.    Defendant nVision's misappropriation of the BioCardia Trade Secrets was willful

16   and malicious and thereby entitles BioCardia to an award of exemplary damages.

17         108.    Defendant nVision was unjustly enriched by having wrongfully detained and/or

18   gained legal title to each of the patents and patent applications in the Sarna Patent Family within

19   the  meaning  of  California  Civil  Code  §§  2223  and/or  2224  as  a  proximate  result  of  the

20   misappropriation of trade secrets as herein alleged, and accordingly BioCardia seeks imposition of

21   a constructive trust on the Sarna Patent Family and any other fruits of the misappropriation of the

22   BioCardia Trade Secrets.

23         109.    BioCardia also seeks imposition of a constructive trust against the Shareholder

24   Defendants for the benefit of BioCardia in the amount of their unjust enrichment based on how

25   much Boston Scientific Corporation paid them for their nVision shares resulting from Ms. Sarna's

26   and nVision's wrongful conduct as herein alleged.

27                                **PRAYER FOR RELIEF**

28         WHEREFORE, BioCardia prays for judgment and relief follows:

                                        -27-

1.      An order correcting of inventorship of the '571 Patent to name Dr. Peter Altman and Dr. Simon Stertzer as co-inventors;

2.      An order directing Defendant nVision to assign to BioCardia each of the patents and patent applications in the Sarna Patent Family;

3.      Damages according to proof;

4.      Exemplary damages in an amount twice BioCardia's actual damages for Defendant nVision's willful and malicious misappropriation of the BioCardia Trade Secrets;

5.      Imposition of a constructive trust against Defendant nVision for the benefit of BioCardia on each of the patents and patent applications in the Sarna Patent Family;

6.      Imposition of a constructive trust against the Shareholder Defendants for the benefit of BioCardia in the amount Boston Scientific Corporation paid them for their nVision shares as a result of Ms. Sarna's and nVision's wrongful conduct;

7.      Disgorgement of any form of benefit, consequential gain, or other secondary enrichment nVision or the Shareholder Defendants received as a result of their unjust enrichment.

8.      Pre-judgment and post-judgment interest; and

9.      Such further and other relief as the Court may deem proper and just.

Dated: May 22, 2020                    By  */s/ Ian N. Feinberg*
                                            Ian N. Feinberg

                                            Attorneys for Plaintiff BioCardia, Inc.

## DEMAND FOR JURY TRIAL

BioCardia demands trial by jury on all claims and issues so triable.

Dated: May 22, 2020                    By  */s/ Ian N. Feinberg*
                                            Ian N. Feinberg

                                            Attorneys for Plaintiff BioCardia, Inc.