David J.F. Gross (SBN 290951)
david.gross@faegredrinker.com
Nick P. Chan (SBN 286925)
nick.chan@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
1950 University Ave., Suite 450
East Palo Alto, CA 94303
Telephone: (650) 324-6700
Facsimile: (650) 324-6701

Timothy E. Grimsrud (*pro hac vice*)
tim.grimsrud@faegredrinker.com
Kevin P. Wagner (*pro hac vice*)
kevin.wagner@faegredrinker.com
Lauren J.F. Barta (*pro hac vice*)
lauren.barta@faegredrinker.com
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota  55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Defendant*
*nVision Medical Corporation*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| BIOCARDIA, INC.<br><br>                    Plaintiff,<br><br>v.<br><br>nVISION MEDICAL CORPORATION, ARBORETUM VENTURES IV, LP, ASTIA ANGEL nVISION LLC, CATALYST HEALTH VENTURES (PF), L.P., CATALYST HEALTH VENTURES FOLLOW-ON FUND, L.P., CATALYST HEALTH VENTURES III, L.P., CATALYST HEALTH VENTURES, LP, CHV INVESTMENTS, LLC, CHV PARTNERS FUND III, L.P., CHV-E PARTNERS III, L.P., DRAPER ASSOCIATES INVESTMENTS, LLC, | CASE NO. 3:20-cv-02829-VC<br><br>**NVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT AND COUNTERCLAIMS**<br><br>**JURY TRIAL DEMANDED** |

DRAPER ASSOCIATES RISKMASTER
FUND II, LLC, DRAPER ASSOCIATES
RISKMASTERS FUND III, LLC,
EXCELESTAR VENTURES I, LLC,
EXXCLAIM CAPITAL PARTNERS I, LP,
FOGARTY INSTITUTE FOR
INNOVATION, GOLDEN SEEDS nVISION
MEDICAL, LLC, LIFE SCIENCES ANGEL
INVESTORS VIII, L.L.C., LMNVC, LLC,
AND SERAPH nVISION, LLC,

                Defendants.

### NVISION MEDICAL CORPORATION'S ANSWER TO BIOCARDIA'S FIRST AMENDED COMPLAINT AND COUNTERCLAIMS

nVision Medical Corporation ("nVision") hereby responds to the claims of BioCardia, Inc. ("BioCardia") asserted in the First Amended Complaint filed on May 22, 2020. All allegations in BioCardia's claims, including those in the headings, that nVision does not expressly admit herein are specifically denied by nVision.

1.      nVision lacks knowledge or information sufficient to form a belief as to the allegations in paragraph 1, and on that basis denies them.

2.      nVision admits that it is a Delaware corporation with its principal place of business at 1192 Cherry Avenue, San Bruno, CA 94066, and is a wholly-owned subsidiary of Boston Scientific Corporation. nVision admits that Boston Scientific Corporation is a Delaware corporation with its principal place of business at 300 Boston Scientific Way, Marlborough, MA 01752-1234. nVision admits that Boston Scientific Corporation acquired nVision, including its intellectual property, through an Agreement and Plan of Merger dated April 13, 2018. Certain of nVision's intellectual property was ultimately assigned to Boston Scientific Scimed, Inc. Accordingly, to the extent paragraph 2 alleges that Boston Scientific Corporation currently owns all intellectual property previously owned by nVision, nVision denies that allegation.

3.      nVision admits that Arboretum Ventures IV, LP held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 3, and on that basis denies them.

4.      nVision admits that Astia Angel nVision LLC held shares in nVision Medical Corporation prior to inVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 4, and on that basis denies them.

5.      nVision admits that Catalyst Health Ventures (PF), L.P. held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 5, and on that basis denies them.

6.      nVision admits that Catalyst Health Ventures Follow-On Fund, L.P. held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.

nVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT,
No. 3:20-cv-02829-VC

nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 6, and on that basis denies them.

   7.  nVision admits that Catalyst Health Ventures III, L.P. held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 7, and on that basis denies them.

   8.  nVision admits that Catalyst Health Ventures, L.P. held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 8, and on that basis denies them.

   9.  nVision admits that CHV Investments, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for

which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 9, and on that basis denies them.

10.     nVision admits that CHV Partners Fund III, L.P. held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 10, and on that basis denies them.

11.     nVision admits that CHV-E Partners III, L.P. held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 11, and on that basis denies them.

12.     nVision admits that Draper Associates Investments, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks

nVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT,
No. 3:20-cv-02829-VC

knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 12, and on that basis denies them.

13.     nVision admits that Draper Associates Riskmaster Fund II, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 13, and on that basis denies them.

14.     nVision admits that Draper Associates Riskmasters Fund III, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 14, and on that basis denies them.

15.     nVision admits that Excelestar Ventures I, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 15, and on that basis denies them.

nVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT,
No. 3:20-cv-02829-VC

16.     nVision admits that eXXclaim Capital Partners I, LP held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 16, and on that basis denies them.

17.     nVision admits that Fogarty Institute for Innovation held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 17, and on that basis denies them.

18.     nVision admits that Golden Seeds nVision Medical, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.  nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision.  nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance."  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 18, and on that basis denies them.

19.     nVision admits that Life Sciences Angel Investors VIII, L.L.C. held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation.

nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 19, and on that basis denies them.

20.     nVision admits that LMNVC, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 20, and on that basis denies them.

21.     nVision admits that Seraph nVision, LLC held shares in nVision Medical Corporation prior to nVision's acquisition by Boston Scientific Corporation. nVision admits that Boston Scientific Corporation ultimately acquired all shares in nVision. nVision denies BioCardia's incomplete and oversimplified allegation that "90% of the initial consideration for which was paid in cash and 10% held in escrow, and additional consideration for which shares is subject to an earn-out based on nVision's performance." nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 21, and on that basis denies them.

22.     The allegations in paragraph 22 are legal conclusions to which no answer is required. To the extent an answer is required, nVision admits that this action purports to be an action that arises under the patent laws of the United States, 35 U.S.C. §§ 101 et seq.,

specifically 35 U.S.C. § 256, the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the laws of the State of California.

23.     The allegations in paragraph 23 are legal conclusions to which no answer is required.  To the extent an answer is required, nVision admits that this action purports to be an action over which this Court has subject matter jurisdiction over BioCardia's patent law claims under 28 U.S.C. §§ 1331 and 1338(a), jurisdiction over BioCardia's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 and has supplemental jurisdiction over BioCardia's state law claims under 28 U.S.C. § 1367.

24.     nVision admits that it is subject to this Court's personal jurisdiction for purposes of this action only.  nVision lacks knowledge or information sufficient to form a belief as to the remaining allegations in paragraph 24, and on that basis denies them.

25.     The allegations in paragraph 25 are legal conclusions to which no answer is required.  To the extent an answer is required, nVision admits that venue is proper in this District for purposes of this action only.

26.     nVision admits that this action involves intellectual property rights and Local Rule 3-2 (c) states that actions involving intellectual property rights are subject to assignment on a district-wide basis.

27.     nVision admits that a purported copy of Ms. Sarna's employment agreement with BioCardia is attached to BioCardia's complaint as Exhibit A.  Except as expressly admitted, nVision lacks sufficient information or belief to respond to the allegations of paragraph 27 and on that basis denies them.

28.     nVision admits that Section 3(b) of Ms. Sarna's BioCardia employment agreement ("Employment Agreement") states:  "I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade

nVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT,
No. 3:20-cv-02829-VC

secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as 'Inventions'), except as provided in Section 3(f) below."  nVision further admits that Section 3(f) of the Employment Agreement states:  "I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B).  I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A."  Except as expressly admitted, nVision lacks sufficient information or belief to respond to the allegations of paragraph 28, and on that basis denies them.

29.     nVision admits that Section 3(a) of the Employment Agreement states: "I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company (collectively referred to as 'Prior Inventions'), which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions."  Except as expressly admitted, nVision lacks sufficient information or belief to respond to the allegations of paragraph 29, and on that basis denies them.

30.     nVision admits that Ms. Sarna filed U.S. Provisional Application No. 61/435,945 on January 25, 2011.  nVision admits that U.S. Patent No. 9,173,571 issued on November 3, 2015 and references U.S. Provisional application No. 61/435,945.  Except as expressly admitted, nVision denies the remaining allegations of paragraph 30.

31.     nVision denies the allegations of paragraph 31.

32.     nVision admits that Ms. Sarna filed US 2014/0323859, which published on October 30, 2014; US 2016/151001, which published on June 2, 2017; and US 2015/605,407,

nVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT,
No. 3:20-cv-02829-VC

published on September 14, 2017; and that each of these applications reference the '945 Provisional Application.  Except as expressly admitted, nVision denies the remaining allegations of paragraph 32.

33.     nVision admits that Ms. Sarna filed Provisional Patent Application No. 61/559,120 on November 13, 2011 and also filed Application No, 14/357,875, which published as US2014/0323859 on October 30, 2014.  nVision also admits that US2014/0323859 refers to the '120 Provisional Application.  Except as expressly admitted, nVision denies the remaining allegations of paragraph 33.

34.     nVision admits that U.S. Application No. 13/979,691 published as US 2013/0296686 on November 7, 2013, and that US 2013/0296686 refers to the '945 Provisional Application.  Except as expressly admitted, nVision denies the remaining allegations of paragraph 34.

35.     nVision admits U.S. Application No. 14/929,989 published as US 2016/0151011 on June 2, 2016, and that US 2016/0151011 refers to the '945 Provisional Application.  nVision admits that U.S. Application No. 14/929,989 issued as U.S. Patent No. 10,610,149 on April 7, 2020.  Except as expressly admitted, nVision denies the remaining allegations of paragraph 35.

36.     nVision admits that U.S. Application No. 15/605,407 published as US 2017/0258392 on September 14, 2017, and that US 2017/0258392 refers to the '945 Provisional Application.  Except as expressly admitted, nVision denies the remaining allegations of paragraph 36.

37.     The statement in paragraph 37 requires no answer.

38.     nVision denies the allegations of paragraph 38.

39.     To the extent paragraph 39 alleges that Ms. Sarna did not invent the inventions in the Sarna Patent Family on her own time and under the provisions of California Labor Code Section 2870, nVision denies the allegations.  To the extent paragraph 39 is directed to the date on which Ms. Sarna conceived of the inventions in the Sarna Patent Family, nVision lacks

sufficient information or belief to respond to the allegations of paragraph 39, and on that basis denies them.

40.     nVision denies that the patent families at issue "do not come within the Section 2870 exemption to Ms. Sarna's obligation to assign them to BioCardia" as a matter of law. Rather, nVision contends that the patent families at issue fall within the scope of California Labor Code Section 2870.  As to the remaining allegations, nVision lacks sufficient information or belief to respond to the remaining allegations of paragraph 40, and on that basis denies them.

41.     To the extent paragraph 41 alleges that Ms. Sarna did not invent the inventions in the Sarna Patent Family on her own time and under the provisions of California Labor Code Section 2870, nVision denies the allegations.  Rather, nVision contends that the patent families at issue fall within the scope of California Labor Code Section 2870.  As to the remaining allegations, nVision lacks sufficient information or belief to respond to the allegations of paragraph 41, and on that basis denies them.

42.     nVision admits that California Labor Code Section 2780 states that:  "(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:  (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) Result from any work performed by the employee for the employer.  (b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable."  To the extent paragraph 42 contains remaining allegations, except as expressly admitted, nVision denies the remaining allegations of paragraph 42.

nVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT,
No. 3:20-cv-02829-VC

43.     nVision admits that California Labor Code Section 2872 states that:  "If an employment agreement entered into after January 1, 1980, contains a provision requiring the employee to assign or offer to assign any of his or her rights in any invention to his or her employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention which qualifies fully under the provisions of Section 2870.  In any suit or action arising thereunder, the burden of proof shall be on the employee claiming the benefits of its provisions."  Except as expressly admitted, nVision denies the allegations of paragraph 43.

44.     nVision denies the allegations of paragraph 44.

45.     nVision denies the allegations of paragraph 45.

46.     nVision denies the allegations of paragraph 46.

47.     nVision admits that the patent specification for U.S. Patent No. 7,402,151 states: "Other applications of this thin walled steerable guide and sheath guide invention include transjugular intrahepatic portosystemic (TIPS) shunt placement, uterine fibroid biopsy and ablation, trans atrial septal delivery and manipulation of devices (for pulmonary vein ablation, implantation and or recovery of devices in the left atrial appendage and performing antegrade mitral and aortic valve manipulations and artificial valve implantation), and also for neurological access and delivery of coils and stents."  Except as otherwise admitted, nVision lacks sufficient information or belief to respond to the allegations of paragraph 47, and on that basis denies them.

48.     nVision lacks sufficient information or belief to respond to the allegations of paragraph 48, and on that basis denies them.

49.     nVision admits that claim 1 of U.S. Patent No. 8,529,550 states:  "A catheter system comprising: a catheter having a proximal end and a distal end; a drug delivery structure disposed on the distal end of the catheter, where the structure is a hollow structure with one or more apertures communicating from the interior to the exterior of said hollow structure, and a reservoir of a therapeutic agent within said drug delivery structure, said therapeutic agent

comprising one of antagonists to angiogenic agents, cytotoxic agents, anti-Her-2, and anti CD20, and tumor necrosis factors; said drug delivery structure being disengageable from the distal end of the catheter; a mechanism at the proximal end of the catheter for disengaging said drug delivery structure from the distal end of the catheter; and a fixation means on said drug delivery structure that may be used within a body of a patient to implant the drug delivery structure to a depth within an intended tissue within the body of a patient."  Except as otherwise admitted, nVision lacks sufficient information or belief to respond to the allegations of paragraph 49, and on that basis denies them.

50.     nVision lacks sufficient information or belief to respond to the allegations of paragraph 50, and on that basis denies them.

51.     nVision lacks sufficient information or belief to respond to the allegations of paragraph 51, and on that basis denies them.

52.     nVision lacks sufficient information or belief to respond to the allegations of paragraph 52, and on that basis denies them.

53.     nVision admits that the '571 Patent states:  "Although illustrative embodiments of this invention have been shown and described, other modifications, changes, and substitutions are intended.  By way of example, the present invention discloses fallopian tubes as an exemplar of a narrow body lumen, which may undergo maintenance, and other anatomical structures, such as coronary arteries, may be similarly maintained.  Accordingly, it is appropriate that the appended claims be construed broadly and in a manner consistent with the scope of the disclosure as set forth in the following claims."  nVision lacks sufficient information or belief to respond to the allegation of paragraph 53 stating that "[c]oronary artery disease was and is a primary focus of BioCardia's business," and on that basis denies it.  nVision denies the remaining allegations of paragraph 53.

54.     nVision denies the allegations of paragraph 54.

55.     nVision denies the allegations of paragraph 55.

56.     The statement in paragraph 56 requires no answer.

57.     nVision denies the allegations of paragraph 57, including the allegations in the table included therein.

58.     nVision lacks sufficient information or belief to respond to the allegations of paragraph 58, and on that basis denies them.

59.     nVision lacks sufficient information or belief to respond to the allegations of paragraph 59, and on that basis denies them.

60.     nVision lacks sufficient information or belief to respond to the allegations of paragraph 60, and on that basis denies them.

61.     nVision denies the allegations of paragraph 61.

62.     nVision admits that the statute of limitations for breach of contract in California is four years.  Except as expressly admitted, nVision denies the allegations of paragraph 62.

63.     nVision denies the allegations of paragraph 63.

64.     nVision denies the allegations of paragraph 64.

65.     nVision admits that the statute of limitations for breach of contract in California is four years.  Except as expressly admitted, nVision denies the allegations of paragraph 65.

66.     nVision admits that under Cal. Civ. Code § 3426.6, trade secret misappropriation claims "must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Except as expressly admitted, nVision denies the allegations of paragraph 66.

67.     nVision admits that claims for correction of inventorship can be barred by laches. Except as expressly admitted, nVision denies the allegations of paragraph 67.

68.     nVision admits that Section 3(f) of the Employment Agreement states:  "I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A."  Except as expressly admitted, nVision denies the allegations of paragraph 68.

69.    nVision denies the allegations of paragraph 69.

70.    nVision denies the allegations of paragraph 70.

71.    nVision denies the allegations of paragraph 71.

72.    nVision denies the allegations of paragraph 72.

## COUNT I
**(Correction of Inventorship under 35 U.S.C. § 256)**
**(Against Defendant nVision)**

73.    nVision incorporates its responses to the allegations in the preceding paragraphs.

74.    nVision denies the allegations of paragraph 74.

75.    nVision denies the allegations of paragraph 75.

76.    nVision denies the allegations of paragraph 76.

77.    nVision denies the allegations of paragraph 77, including because Dr. Altman and Dr. Stertzer are not inventors on the patent at issue.

78.    nVision denies the allegations of paragraph 78, including because Dr. Altman and Dr. Stertzer are not inventors on the patent at issue.

79.    nVision lacks sufficient information or belief to respond to the allegations of paragraph 79, and on that basis denies them.

80.    nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 80.

## COUNT II
**(Imposition of Constructive Trust Based on Unjust Enrichment)**
**(Against All Defendants)**

81.    nVision incorporates its responses to the allegations in the preceding paragraphs.

82.    nVision denies the allegations of paragraph 82.

83.    nVision denies the allegations of paragraph 83.

84.    nVision denies the allegations of paragraph 84.

85.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 85.  nVision denies the remaining allegations in paragraph 85.

86.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 86.  nVision denies the remaining allegations in paragraph 86.

87.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 87.  nVision denies the remaining allegations in paragraph 87.

88.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 88.  nVision denies the remaining allegations in paragraph 88.

## COUNT III
**(Misappropriation of Trade Secrets under California Uniform Trade Secrets Act Under California Civil Code Sections 3426 et seq**
**(Against nVision and Imposition of Constructive Trust Against All Defendants Based on Their Unjust Enrichment)**

89.     nVision incorporates its responses to the allegations in the preceding paragraphs.

90.     nVision denies the allegations of paragraph 90.

91.     nVision denies the allegations of paragraph 91.

92.     nVision denies the allegations of paragraph 92.

93.     nVision denies the allegations of paragraph 93.

94.     nVision denies the allegations of paragraph 94.

95.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 95.  nVision denies the remaining allegations in paragraph 95.

96.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 96.  nVision denies the remaining allegations in paragraph 96.

97.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 97.  nVision denies the remaining allegations in paragraph 97.

98.     nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 98.  nVision denies the remaining allegations in paragraph 98.

## COUNT IV
### (Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836)
### (Against nVision and Imposition of Constructive Trust Against All Defendants)

99.     nVision incorporates its responses to the allegations in the preceding paragraphs.

100.    nVision denies the allegations of paragraph 100.

101.    nVision denies the allegations of paragraph 101.

102.    nVision denies the allegations of paragraph 102.

103.    nVision denies the allegations of paragraph 103.

104.    nVision denies the allegations of paragraph 104.

105.    nVision denies the allegations of paragraph 105.

106.    nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 106.  nVision denies the remaining allegations in paragraph 106.

107.    nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 107.  nVision denies the remaining allegations in paragraph 107.

108.    nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 108.  nVision denies the remaining allegations in paragraph 108.

109.    nVision denies that BioCardia is entitled to any relief, including the relief sought in paragraph 109.  nVision denies the remaining allegations in paragraph 109.

## NVISION'S AFFIRMATIVE DEFENSES

Without assuming any burden it would not otherwise bear, nVision asserts the following Affirmative Defenses:

### I.     Failure to State A Claim Upon Which Relief Can Be Granted

110.    All of BioCardia's claims fail to state a claim upon which relief can be granted.

111.    BioCardia's claim for correction of inventorship should be dismissed for failure to state a claim because there is no error related to inventorship; Dr. Peter Altman and Dr. Simon Stertzer made no inventive contribution to the '571 Patent.

18

112.    No one at BioCardia contributed to the conception or reduction to practice of the invention claimed in the '571 Patent, nor any other invention in related patent applications, including Provisional Application No. 61/435,945 ("the '945 Provisional"); Application No. 13/979,691; Application No. 14/929,989; and Application No. 15/605,407 (collectively, "the '571 Patent Family").  Nor did anyone at BioCardia contribute to the conception or reduction to practice of the inventions in Provisional Patent Application No. 61/559,120 ("the '120 Provisional"), filed on November 13, 2011, or applications claiming priority to the '120 Provisional, including Application No. 14/357,875, which published on October 30, 2014, as US2014/0323859 (collectively, "the '120 Provisional Family").

113.    Not all of the inventions disclosed in the '571 Patent Family and '120 Provisional Family were conceived during the time period when Sarna was an employee of BioCardia.

114.    To the extent inventions disclosed in the '571 Patent Family and '120 Provisional Family were conceived during the time period that Sarna was a BioCardia employee, Sarna's work on those inventions was done on her own time and without any assistance from BioCardia or use of any BioCardia equipment, supplies, facilities, trade secrets, or other resources.

115.    To the extent inventions disclosed in the '571 Patent Family and '120 Provisional Family were conceived during the time period that Sarna was a BioCardia employee, those inventions neither (1) relate at the time of conception or reduction to practice of the invention to BioCardia's business, or actual or demonstrably anticipated research or development nor (2) result from any work performed by Sarna for BioCardia.

116.    Therefore, BioCardia's claim for unjust enrichment fails to state a claim because Sarna was exempt from assigning over her intellectual property pursuant to California Labor Code § 2870.  Therefore, Sarna did not breach her agreement.

117.    Furthermore, BioCardia's claim for unjust enrichment should be dismissed against nVision for failure to state a claim, including at least because nVision is not a party to the contract at issue.  The contract at issue is the employment contract between Sarna and BioCardia;

nVision is not a party to that contract, nor has it assumed any aspect of the contract.  Thus, nVision cannot be liable for any alleged breach of Sarna's employment contract.

118.    BioCardia's trade secret misappropriation claims should be dismissed for failure to state a claim at least because the information BioCardia claims is a "trade secret" does not constitute a trade secret under the California Uniform Trade Secrets Act ("CUTSA," Cal. Civ. Code §§ 3426 et seq.) or Defend Trade Secrets Act ("DTSA," 18 U.S.C. § 1836), nor was it misappropriated by nVision.

119.    BioCardia's trade secret misappropriation claim under the DTSA should also be dismissed for failure to state a claim because Ms. Sarna did not commit any act of alleged misappropriation after the effective date of the DTSA.  Ms. Sarna left BioCardia's employment in January 2012, and BioCardia does not allege that Ms. Sarna had access to any BioCardia trade secrets after that date.  In addition, BioCardia alleges that Ms. Sarna disclosed BioCardia's trade secrets when she filed her provisional patent applications in 2011.

## II.    Lack of Standing

120.    BioCardia's claims for correction of inventorship and trade secret misappropriation should be dismissed because BioCardia lacks standing to bring such claims. BioCardia has no ownership interest in the patents or trade secrets at issue.  Further, declaring Dr. Peter Altman or Dr. Simon Stertzer to be co-inventors would not generate any "direct financial rewards" for BioCardia, as required for standing to bring a claim.  *See Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1327 (Fed. Cir. 2009).  Moreover, an action to correct inventorship in district court can only be brought for patents issued; it is inapplicable to patent applications not yet issued.  *See HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1353-54 (Fed. Cir. 2010), *as amended on reh'g in part* (June 14, 2010).

## III.    Bona Fide Purchaser

121.    BioCardia's claims should be dismissed to the extent they are barred, in whole or in part, because Boston Scientific Corporation and/or Boston Scientific Scimed, Inc. (collectively

"Boston Scientific") was a bona fide purchaser of all the intellectual property at issue under 35 U.S.C. § 261.  Boston Scientific paid valuable consideration during the merger with nVision, which included nVision's intellectual property, and Boston Scientific was without notice of any prior encumbrances.  *See Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 74 (Fed. Cir. 1991).

122.    BioCardia's claims should also be dismissed to the extent they are barred, in whole or in part, because nVision also owned all the intellectual property at issue as a bona fide purchaser under 35 U.S.C. § 261, as it purchased the intellectual property for valuable consideration and without notice of BioCardia's allegations regarding ownership.

123.    BioCardia, moreover, did not record its alleged ownership interests with the U.S. Patent and Trademark Office.

### IV.    Statute of Limitations

124.    BioCardia's claims should be dismissed to the extent they are barred by applicable statutes of limitations.  Breach of contract claims in the state of California have a four-year statute of limitations.  *See* Cal. Code Civ. P. § 337.  Upon information and belief, Sarna ended her employment with BioCardia on January 4, 2012, and BioCardia knew, or at a minimum, reasonably should have known, of the inventions in the '571 Patent and Family by at least November 7, 2013, the publication date of the application for the '571 Patent.  BioCardia's claim for unjust enrichment based on Sarna's purported breach of contract was not brought until April 23, 2020, over six years after the statute of limitations began to run.

125.    The statute of limitations for trade secret misappropriation under both the CUTSA and the DTSA is three years.  *See* Cal. Civ. Code. §3426.6; 18 U.S.C. § 1836.  BioCardia knew, or at a minimum, reasonably should have known, of the inventions in the '945 Provisional and '571 Patent by at least November 7, 2013, the publication date of the application for the '571 Patent.  BioCardia did not bring its misappropriation of trade secrets claims until April 23, 2020, over six years after the statute of limitations began to run.

126.    Accordingly, BioCardia's claims are barred by the applicable statute of limitations.

## V.    Laches, Estoppel, and/or Other Equitable Doctrines

127.    BioCardia's claims should be dismissed as they are barred by, at least, the doctrines of laches and equitable estoppel.  Where a party waits more than six years to bring a claim for correction of inventorship, a "rebuttable presumption of laches attaches."  *Lismont v. Alexander Binzel Corp.*, 813 F.3d 998, 1003 (Fed. Cir. 2016).  Additionally, BioCardia knew, or at a minimum, reasonably should have known, of the inventions in the '571 Family and '120 Provisional Family by at least November 7, 2013, and October 30, 2014, respectively.  On information and belief, BioCardia was aware in 2012 that Sarna had left BioCardia to work full-time at nVision, and that Sarna and nVision were developing products in women's health.  Indeed, in June 2013, BioCardia's then-Chief Operating Officer, Andrew MacKenzie, heard Sarna speak about nVision and nVision's products and patents at a conference and subsequently emailed Sarna to congratulate her on "how successful [she had] been at pursuing the birth of [her] company."  (Ex. A.)  Yet, BioCardia did not file its claims against nVision until April 23, 2020, years after Boston Scientific acquired nVision in a publicized merger.  Accordingly, all of BioCardia's claims are barred by, at least, the equitable doctrines of laches and equitable estoppel.

## VI.    No Basis for Imposing a Constructive Trust

128.    BioCardia has no basis for imposing a constructive trust against nVision and is barred from seeking such a remedy.  The elements of a constructive trust require:  "(1) the existence of a res (property or some interest in property); (2) the right of a complaining party to that res; and (3) some wrongful acquisition or detention of the res by another party who is not entitled to it."  *Sustainable Ranching Partners, Inc. v. Bering Pac. Ranches Ltd.*, No. 17-CV-202323-JST, 2018 WL 1696805, at *3 (N.D. Cal. Apr. 6, 2018) (citation omitted).   Here, (1) BioCardia is not entitled to any property interest belonging to nVision; (2) as to the Sarna Patent

Family over which BioCardia seeks a constructive trust, nVision does not possess the Sarna

Patent Family property interests at issue, which were rightfully and lawfully acquired by Boston

Scientific Scimed, Inc.; and (3) as to BioCardia's allegations in paragraphs 97 and 108 seeking a

constructive trust over "any other fruits of the misappropriation of the BioCardia Trade Secrets,"

BioCardia has failed to identify the existence of a res upon which it could seek a constructive

trust from nVision.  Moreover, nVision does not possess the proceeds of the Merger with Boston

Scientific; those proceeds were paid either to the former nVision shareholders or into an escrow.

Thus, BioCardia cannot meet the elements required to impose a constructive trust and this

remedy is unavailable as to nVision.

129.    Additionally, to the extent BioCardia contends that imposition of a constructive

trust is a remedy available pursuant to its trade secret misappropriation claim, imposition of a

constructive trust is not a permitted remedy under the CUTSA, *see B. Braun Med., Inc. v.

Rogers*, 163 F. App'x 500, 509 (9th Cir. 2006) (unpublished), or the DTSA.

## VII.    Failure to Mitigate Damages

130.    To the extent that BioCardia can establish it is entitled to damages, BioCardia had

and continues to have a duty to take reasonable steps to mitigate those damages "and will not be

able to recover for any losses which could have been thus avoided."  *Cent. Coast Pipe Lining,

Inc. v. Pipe Shield USA, Inc.*, No. 2:13-CV-00639-ODW, 2013 WL 6442603, at *7 (C.D. Cal.

Dec. 9, 2013) ("California law is clear that a 'plaintiff who suffers damage as a result of either a

breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will

not be able to recover for any losses which could have been thus avoided.'") (citation omitted).

131.    For example, rather than make any good faith attempt or take reasonable steps to

enter the women's health space, BioCardia simply idled by for *years* before threatening Sarna

with legal action and ultimately filing these claims of unjust enrichment based on allegations of

breach of contract and trade secret misappropriation.  Moreover, BioCardia waited until Sarna

had capitalized on her success by selling control of her company in a high-profile merger with

Boston Scientific before threatening litigation.

## VIII.   Reservation of Rights

nVision reserves the right to supplement its assertion of defenses as the factual investigation of BioCardia's claims continues.

## NVISION'S COUNTERCLAIMS

nVision alleges the following counterclaims against BioCardia.

## NATURE OF ACTION

1.      nVision brings this action seeking various declaratory judgments and other relief to address the allegations by BioCardia against nVision in its First Amended Complaint.  Among other things, BioCardia's Complaint includes allegations of trade secret misappropriation and unjust enrichment based on allegations of breach of contract.

2.      BioCardia's allegations and claims have no merit.  The patent in question—U.S. Patent No. 9,173,571 ("the '571 Patent")—is assigned to Boston Scientific Scimed, Inc. and correctly lists Ms. Sarna as the sole inventor.  No one at BioCardia contributed to the conception or reduction to practice of the inventions claimed in the '571 Patent, nor any other inventions in related patent applications, including Provisional Application No. 61/435,945; Application No. 13/979,691; Application No. 14/929,989; and Application No. 15/605,407 (collectively, "the '571 Family").  Nor did anyone at BioCardia contribute to the conception or reduction to practice of the inventions in Provisional Patent Application No. 61/559,120 ("the '120 Provisional"), which Ms. Sarna filed on November 13, 2011, or applications claiming priority to the '120 Provisional, including Application No. 14/357,875, which published on October 30, 2014, as US2014/0323859 (collectively, "the '120 Provisional Family").

3.      Boston Scientific Scimed, Inc. owns the '571 Family and the '120 Provisional Family.  Upon information and belief, Ms. Sarna's conception and development of both the '571 Family and '120 Provisional Family falls squarely within California Labor Code Section 2870, including because Ms. Sarna independently developed the inventions without any assistance

from BioCardia, and the inventions had nothing to do with BioCardia's business, research, or development.  BioCardia's business, research, and development is directed to cardiovascular disease, specifically therapeutic candidates and biotherapeutic delivery systems for cardiovascular disease.  Indeed, its filings with the SEC reflect the same.  For example, in its 2015 S-1 filing, BioCardia stated "We are a clinical-stage regenerative medicine company developing novel therapeutics for cardiovascular diseases with large unmet medical needs." BioCardia further stated "We are committed to applying our expertise in the fields of autologous and allogeneic cell-based therapies to improve the lives of patients with cardiovascular conditions."  In contrast, the inventions of the '571 Family and the '120 Provisional Family are directed to women's health.

4.     Upon information and belief, Ms. Sarna left BioCardia in 2012 to work full-time at nVision, with BioCardia's knowledge.  Ms. Sarna legally assigned the '571 Family and '120 Provisional Family to nVision for valuable consideration.  nVision was, at that time, the owner of all right and title in the '571 Family and '120 Provisional Family, including under state law and as a bona fide purchaser under 35 U.S.C. § 261.  Years later, Boston Scientific Corporation acquired the '571 Family and '120 Provisional Family upon its acquisition of nVision through the Merger on April 13, 2018 and the patents and applications were assigned to Boston Scientific Scimed, Inc.  Boston Scientific Scimed, Inc. is therefore the owner of all right and title in the '571 Family and '120 Provisional Family, including under state law and as a bona fide purchaser under 35 U.S.C. § 261.

5.     Contrary to BioCardia's allegations, neither the '571 Family nor the '120 Provisional Family are based on misappropriated trade secrets of BioCardia.  The '571 Family and '120 Provisional Family have nothing to do with BioCardia's business, research, or development, and are not based on any trade secret information of BioCardia.  In addition, BioCardia's alleged trade secrets were not trade secrets at all, including because they reflect information that was publicly known at the time of the purported disclosure and because

nVISION MEDICAL CORPORATION'S ANSWER TO FIRST AMENDED COMPLAINT,
No. 3:20-cv-02829-VC

BioCardia did not take reasonable measures to protect their secrecy.  Nor has nVision ever used any trade secrets of BioCardia.

6.      BioCardia's allegations are also time-barred or otherwise foreclosed under relevant statutes of limitations, laches, and/or estoppel doctrines.  On information and belief, BioCardia was aware of Ms. Sarna's desire to develop a company focused on women's health and never expressed any concern with nVision, nVision's intellectual property, and/or Ms. Sarna's work with nVision.  To the contrary, in June 2013, BioCardia's then-Chief Operating Officer, Andrew MacKenzie, heard Ms. Sarna speak about nVision and nVision's products and patents at a conference.  (*See* Ex. B, Ms. Sarna's June 2013 Presentation Slides.)  After hearing Ms. Sarna's presentation at this conference, Mr. MacKenzie did not raise any objections to Ms. Sarna's work for nVision or her patents, but rather subsequently emailed Ms. Sarna to congratulate her on "how successful [she had] been at pursuing the birth of [her] company."  (Ex. A, June 2013 MacKenzie/Sarna Email Exchange.)  On information and belief, Ms. Sarna also informed BioCardia that she had filed the patent applications in question.  BioCardia also knew, or at a minimum, reasonably should have known, of the application for the '571 Patent by at least November 7, 2013, the date the application published as US2013/0296686.  BioCardia never raised any concerns with Ms. Sarna or nVision about any patent applications or patents filed by Ms. Sarna or nVision until close to a year after Boston Scientific's highly publicized acquisition of nVision for an upfront payment of $150 million.  In particular, BioCardia first raised the issues in this dispute in a letter dated April 9, 2019, over seven years after Ms. Sarna's departure from BioCardia, and over five years after the application for the '571 Patent published.  BioCardia did not file a complaint against nVision until April 23, 2020.  BioCardia's decision to suddenly raise its tardy and baseless allegations after Boston Scientific's acquisition of nVision is nothing but a transparent attempt to improperly capitalize on nVision's success.  In any event, BioCardia's unreasonable delay means that any claims by BioCardia are time-barred under

relevant statutes of limitations or otherwise foreclosed under laches, estoppel, and/or other equitable doctrines.

## PARTIES

7.      nVision is a Delaware corporation with its principal place of business at 1192 Cherry Avenue, San Bruno, CA 94066, and is a wholly-owned subsidiary of Boston Scientific Corporation.

8.      Upon information and belief, BioCardia is a corporation organized and existing under the laws of Delaware, with its principal place of business at 125 Shoreway Road, Suite B, San Carlos, CA 94070.

## JURISDICTION AND VENUE

9.      This action arises under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, the patent laws of the United States, 35 U.S.C. §§ 101, *et seq*., and the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.

10.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). In addition, this Court has supplemental jurisdiction over state law claims—including those involving no trade secret misappropriation, and no unjust enrichment—under 28 U.S.C. § 1367.

11.     This Court has general personal jurisdiction over BioCardia, as BioCardia has its principal place of business in this District.  This Court also has specific personal jurisdiction over BioCardia, as BioCardia's activities giving rise to this action occurred in this District.

12.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1400.

## FACTUAL BACKGROUND

### *nVision*

13.     On information and belief, long before starting her employment at BioCardia, Ms. Sarna was interested in forming a medical company focused on the field of women's health. When Ms. Sarna was 13 years old, she developed a complex ovarian cyst.  Doctors were unable to tell if the cyst was cancerous.  The only testing available at that time was invasive surgery or a

blood test notorious for false cancer diagnoses.  After some time, doctors eventually determined that her cyst was benign.  The lack of adequate medical testing devices available when Ms. Sarna suffered her cancer scare led her to believe that there was a dearth of innovation in the women's health space.  This caused Ms. Sarna to study molecular and cell biology and conduct research in the area of bioengineering while in college.

14.     After she graduated from the University of California, Berkeley in 2007, Ms. Sarna was hired by Abbott Vascular, where she worked from 2007-2008.  Ms. Sarna left Abbott Vascular to work at BioCardia in 2008.

15.     On information and belief, while employed at BioCardia, Ms. Sarna openly shared her interests in starting her own medical company focused on women's health with her colleagues at BioCardia, including Dr. Peter Altman, BioCardia's President and CEO, and her supervisors, Mr. Snow and Mr. Mackenzie.  Dr. Altman, Mr. Snow, and Mr. Mackenzie were fully supportive of Ms. Sarna's goal of forming her own company in women's health.  In fact, on information and belief, Ms. Sarna was told by Dr. Altman that she had permission to pursue her own projects relating to women's health on her own time and using her own resources, as such projects were outside the scope of BioCardia's business and research and development efforts.

16.     To that end, during the 2008-2012 time period, and with BioCardia's knowledge, Ms. Sarna continued to work independently and on her own time—often at night and on weekends out of her home—researching issues in women's health and ideas for starting a medical company focused on women's health, all on her own time and without the use of any BioCardia resources.

17.     Ms. Sarna's independent research on issues in women's health led to her filing two provisional patent applications in 2011.

18.     Ms. Sarna filed provisional patent application No. 61/435,945 ("'945 Provisional")—entitled "Transvaginal device and technique to access the fimbria of the fallopian tubes via the uterotubal ostium in order to both diagnose and treat occlusions and disease"—on

January 25, 2011.  The '945 Provisional was based on inventions Ms. Sarna had independently

conceived, on her own time, and without any assistance from BioCardia or use of any BioCardia

equipment, supplies, facilities, trade secrets, or other resources.  The '945 Provisional was

directed to "embodiments of a catheter with the ability to diagnose, sample and treat fallopian

tube occlusion and disease."  Ms. Sarna subsequently filed several utility applications claiming

priority to the '945 Provisional, including Application No. 13/979,691, which published on

November 7, 2013, and subsequently issued as the '571 Patent on November 3, 2015.  The '571

Patent is titled "Systems and methods for maintaining a narrow body lumen," and describes

systems and methods for diagnostic imaging or therapeutic treatment of the fallopian tubes.

Other applications claiming priority to the '945 Provisional include (1) Application No.

14/929,989, which published on June 2, 2016 as US2016/0151011; and (2) Application No.

15/605,407, which published on September 14, 2017 as US2017/0258392.  These applications

and the '571 Patent are all part of the '571 Family, and all were conceived by Ms. Sarna, on her

own time, and without any assistance from BioCardia or use of any BioCardia equipment,

supplies, facilities, trade secrets, or other resources.

   19. Ms. Sarna also filed Provisional Patent Application No. 61/559,120 on November

13, 2011 ("the '120 Provisional"), entitled "Device and method to confirm occlusion of the

fallopian tube."  Ms. Sarna subsequently filed Application No. 14/357,875, which claimed

priority to the '120 Provisional, and which published on October 30, 2014, as US2014/0323859.

These applications, and any other application claiming priority to the '120 Provisional, are all

part of the '120 Provisional Family and were conceived by Ms. Sarna, on her own time, and

without any assistance from BioCardia or use of any BioCardia equipment, supplies, facilities,

trade secrets, or other resources.

   20. On information and belief, Ms. Sarna provided BioCardia with written

notification of the patent applications she filed in 2011—namely, the '945 Provisional and the

'120 Provisional.

21.     On information and belief, Ms. Sarna left BioCardia on January 4, 2012, to work full-time at nVision.

22.     After Ms. Sarna left BioCardia, she kept in touch with her BioCardia superiors and colleagues—including Dr. Altman and Mr. MacKenzie—and kept them apprised of her position as an entrepreneur in the field of women's health.  For example, in June 2013, BioCardia's then COO, Mr. MacKenzie, heard Ms. Sarna speak at a conference about nVision, the ovarian cancer detection device she was developing, the design of the devices she was developing, and the patents she had filed for nVision.  (*See* Ex. B.)  Mr. MacKenzie subsequently emailed Ms. Sarna to congratulate her on "how successful [she had] been at pursuing the birth of [her] company."  (Ex. A.)

23.     BioCardia was therefore fully aware of nVision and Ms. Sarna's goal of developing nVision into a leading company in the field of women's health.

24.     Ms. Sarna spent the next six years working full-time developing nVision's business, which, as stated on its website, was "dedicated to filling the void in women's health innovation."  During this time, the work of Ms. Sarna and her other nVision colleagues included extensive focus on research, product development, clinical studies, and regulatory matters.

25.     With respect to product development, nVision initially experimented with trying to develop a commercial prototype for a visualization device based on the '571 Family, and even hired an external engineering firm to provide assistance.  However, on information and belief, nVision met a number of challenges and abandoned the project around May 2013.

26.     Realizing the challenges with visualization devices, Ms. Sarna refocused her efforts in 2012 and 2013 on discovering other detection mechanisms for ovarian cancer.  This led to a new collaboration with Dr. Albert Chin and a change in direction for nVision's product development.

27.     Ms. Sarna met Dr. Chin in about September 2012.  Dr. Chin had extensive experience in medical-device development, which aligned well with Ms. Sarna's and nVision's

goals for developing women's health devices.  Dr. Chin and nVision entered into a formal consulting agreement in January 2013.

28.     On information and belief, Ms. Sarna and Dr. Chin started collaborating immediately to develop new medical devices for women's health, including ovarian cancer detection.  In particular, with Ms. Sarna's understanding of fallopian tube anatomy and Dr. Chin's medical-device development experience, Ms. Sarna and Dr. Chin co-invented a balloon, which, as it inflated, would follow the path from the uterus into a fallopian tube and collect cells on its surface.  After collection of the cells, testing could be performed to detect the presence or absence of cancer.  Ms. Sarna and her team created a prototype of this invention in July 2013, which ultimately led to the Mako Device.

29.     Ms. Sarna and Dr. Chin filed for patent protection on the Mako Device.  There are several patent applications relating to the Mako Device, including US 2015/0351729A1 (filed February 3, 2014), WO 2014/121207A1 (filed February 3, 2014), and US 2016/0278747A1 (filed February 25, 2016), all of which are referred to collectively as the "Mako Device Patent Family."  The Mako Device Patent Family is not related to the '571 Family or the '120 Provisional Family.

30.     Boston Scientific eventually acquired nVision in April 2018.  Upon execution of the Merger, the '571 Family and '120 Provisional Family were assigned to Boston Scientific Scimed, Inc.  Boston Scientific thus acquired complete ownership of nVision and all of its intellectual property, including the '571 Family and '120 Provisional Family.

### The Dispute

31.     For many years after Ms. Sarna's departure from BioCardia in January 2012 no one from BioCardia ever raised any issue with nVision's business or patents, or otherwise suggested that any of nVision's patents or patent applications were based on technology belonging to BioCardia.  To the contrary, in June 2013, BioCardia's then-Chief Operating Officer, Andrew MacKenzie, heard Ms. Sarna speak about nVision and nVision's products and

patents at a conference and subsequently emailed Ms. Sarna to congratulate her on "how successful [she had] been at pursuing the birth of [her] company."  (Exs. A, B.)

32.     On April 23, 2020, BioCardia filed this action against nVision.

33.     nVision now brings this action for declaratory judgments and other relief to address BioCardia's unfounded allegations.

## COUNT I

## (DECLARATORY JUDGMENT OF NO UNJUST ENRICHMENT)

34.     All of the preceding paragraphs, including all facts and allegations contained therein, are incorporated by reference.

35.     As set forth above, BioCardia has alleged that nVision was unjustly enriched by having wrongfully detained and/or gained legal title to each of the patents and patent applications in the Sarna Patent Family within the meaning of California Civil Code §§ 2223 and/or 2224 as a proximate result of Ms. Sarna's breach of contract and accordingly BioCardia seeks imposition of a constructive trust on the Sarna Patent Family.

36.     BioCardia is not entitled to seek any type of unjust enrichment remedy from nVision.  As set forth above, BioCardia has no basis for any inventorship claim regarding the '571 Patent, or any ownership claim regarding the '571 Family or '120 Provisional Family.  Nor does BioCardia have any claim that any application or patent in the '571 Family or '120 Provisional Family was based on any misappropriated trade secrets of BioCardia, or that nVision otherwise misappropriated any trade secrets of BioCardia.  Accordingly, BioCardia has no claim for unjust enrichment against nVision.

37.     In addition, any claim by BioCardia for unjust enrichment is barred by California's statute of limitations, as set forth above, or otherwise foreclosed under laches, estoppel, and/or other equitable doctrines.  As explained above, BioCardia knew, or at a minimum, reasonably should have known, of the inventions in the '571 Family and '120 Provisional Family by at least November 7, 2013, and October 30, 2014, respectively.

BioCardia was also aware in 2012 that Ms. Sarna had left BioCardia to work full-time at nVision, and that Ms. Sarna and nVision were developing products in women's health.  Indeed, in June 2013, BioCardia's then-Chief Operating Officer, Andrew MacKenzie, heard Ms. Sarna speak about nVision and nVision's products and patents at a conference and subsequently emailed Ms. Sarna to congratulate her on "how successful [she had] been at pursuing the birth of [her] company."  (Exs. A, B.)

38.      nVision no longer possesses any interest in the Sarna Patent Family, as it rightfully and lawfully assigned its rights in the Sarna Patent Family to Boston Scientific.

39.      nVision does not possess any of the proceeds of the Merger with Boston Scientific; those proceeds were paid either to the former nVision shareholders or into an escrow.

40.      BioCardia's threats and allegations have created a substantial dispute between the parties of sufficient immediacy and reality to warrant the issuance of declaratory judgment relief regarding whether nVision was unjustly enrichment.

41.      nVision is therefore entitled to a judgment declaring that it was not unjustly enriched and no constructive trust should be imposed as to any of nVision's property.

## COUNT II

## (DECLARATORY JUDGMENT OF NO TRADE SECRET MISAPPROPRIATION BY NVISION UNDER CUTSA)

42.      All of the preceding paragraphs, including all facts and allegations contained therein, are incorporated by reference.

43.      BioCardia has alleged that nVision misappropriated the BioCardia Trade Secrets by disclosing and/or using such information to apply for the Sarna Patent Family Inventions and to make the purported inventions claimed in the Sarna Patent Family without BioCardia's consent, and using the BioCardia Trade Secrets as alleged in paragraphs 54-57 of its First Amended Complaint.

44.     BioCardia has alleged that nVision took advantage of the misappropriated BioCardia Trade Secret by having Ms. Sarna disclose and/or use such information for the advancement and benefit of nVision despite being aware of Ms. Sarna's duties and obligations to BioCardia to limit the disclosure and use of such information only for the benefit of BioCardia and that such disclosure was in violation of the Sarna Agreement.

45.     BioCardia's allegations have no merit, for all the reasons set forth above.  As set forth above, none of the patents or patent applications in the '571 Family or '120 Provisional Family are based on any misappropriated trade secrets of BioCardia.  Nor did nVision ever use or misappropriate any trade secrets of BioCardia.

46.     In addition, any claim by BioCardia for misappropriation of trade secrets by nVision is barred by California's three-year statute of limitations for trade secret misappropriation.  As explained above, BioCardia knew, or at a minimum, reasonably should have known, of the inventions in the '571 Family and '120 Provisional Family by at least November 7, 2013, and October 30, 2014, respectively.  BioCardia was also fully aware of the fact that Ms. Sarna had started nVision in 2012 and was developing products in women's health. Indeed, in June 2013, BioCardia's then-Chief Operating Officer, Andrew MacKenzie, heard Ms. Sarna speak about nVision and nVision's products and patents at a conference and subsequently emailed Ms. Sarna to congratulate her on "how successful [she had] been at pursuing the birth of [her] company." (Exs. A, B.)  Accordingly, the statute of limitations provides another basis for finding that nVision did not misappropriate any trade secrets of BioCardia.

47.     BioCardia's threats and allegations have created a substantial dispute between the parties of sufficient immediacy and reality to warrant the issuance of declaratory judgment relief regarding whether nVision misappropriated any trade secrets of BioCardia under California's Uniform Trade Secrets Act or other applicable state law.

48.     nVision is therefore entitled to a judgment declaring that it did not misappropriate any trade secrets of BioCardia under California's Uniform Trade Secrets Act or other applicable state law.

## COUNT III

## (DECLARATORY JUDGMENT OF NO TRADE SECRET MISAPPROPRIATION BY NVISION UNDER FEDERAL LAW)

49.     All of the preceding paragraphs, including all facts and allegations contained therein, are incorporated by reference.

50.     The Defend Trade Secrets Act ("DTSA") was enacted on May 11, 2016.

51.     BioCardia has alleged that nVision misappropriated the BioCardia Trade Secrets by disclosing and/or using such information to apply for the Sarna Patent Family Inventions and to make the purported inventions claimed in the Sarna Patent Family without BioCardia's consent, and using the BioCardia Trade Secrets as alleged in paragraphs 54-57 of its First Amended Complaint.

52.     BioCardia has alleged that nVision took advantage of the misappropriated BioCardia Trade Secret by having Ms. Sarna disclose and/or use such information for the advancement and benefit of Vision despite being aware of Ms. Sarna's duties and obligations to BioCardia to limit the disclosure and use of such information only for the benefit of BioCardia and that such disclosure was in violation of the Sarna Agreement.

53.     BioCardia's allegations have no merit, for all the reasons set forth above, including in connection with nVision's request for declaratory judgment that nVision did not misappropriate any trade secrets of BioCardia under the CUTSA.

54.     In addition, Ms. Sarna left BioCardia's employment in January 2012, and BioCardia does not allege that Ms. Sarna had access to any BioCardia trade secrets after that date.  In addition, BioCardia alleges that Ms. Sarna disclosed BioCardia's trade secrets when she

filed her provisional patent applications in 2011. Therefore, Ms. Sarna did not commit any act of alleged misappropriation after the effective date of the DTSA.

55.     In addition, any claim by BioCardia for misappropriation of trade secrets by nVision is barred by the DTSA's three-year statute of limitations for trade secret misappropriation, for all the reasons set forth above.

56.     BioCardia's threats and allegations have created a substantial dispute between the parties of sufficient immediacy and reality to warrant the issuance of declaratory judgment relief regarding whether nVision misappropriated any trade secrets of BioCardia under the DTSA.

57.     nVision is therefore entitled to a judgment declaring that nVision did not misappropriate any trade secrets of BioCardia under the DTSA.

## REQUEST FOR RELIEF

WHEREFORE, nVision respectfully requests that the Court:

A.     Dismiss all of BioCardia's claims against nVision on the merits and with prejudice;

B.     Declare and enter judgment that BioCardia is not entitled to any unjust enrichment remedies against nVision;

C.     Declare and enter judgment that nVision did not misappropriate any trade secrets of BioCardia under state law;

D.     Declare and enter judgment that nVision did not misappropriate any trade secrets of BioCardia under federal law;

E.     Award nVision all costs, expenses, and reasonable attorneys fees as allowed by law; and

F.     Grant nVision any such further relief to which it may be entitled.

Respectfully submitted,

Dated: June 22, 2020                    **FAEGRE DRINKER BIDDLE & REATH LLP**


By:   */s/ Timothy E. Grimsrud*
      David J.F. Gross (SBN 290951)
      Nick P. Chan (SBN 286925)
      FAEGRE BAKER DANIELS LLP
      1950 University Avenue, Suite 450
      East Palo Alto, CA 94303
      Telephone: (650) 324-6700
      Fax: (650) 324-6701
      david.gross@FaegreBD.com
      nick.chan@FaegreBD.com

      Timothy E. Grimsrud (*pro hac vice*)
      Kevin P. Wagner (*pro hac vice*)
      Lauren J.F. Barta (*pro hac vice*)
      FAEGRE BAKER DANIELS LLP
      2200 Wells Fargo Center
      90 South 7th Street
      Minneapolis, MN 55402
      Telephone: (612) 766-7000
      Fax: (612) 766-1600
      tim.grimsrud@FaegreBD.com
      kevin.wagner@FaegreBD.com
      lauren.barta@FaegreBD.com

      ***Attorneys for Defendant nVision Medical Corporation***